17 A.3d 801

GREGORY RUSSO, PLAINTIFF–APPELLANT, v. BOARD OF TRUSTEES, POLICE AND FIREMEN'S RETIREMENT SYSTEM, DEFENDANT–RESPONDENT.

Argued March 1, 2011—Decided May 17, 2011.

 

————

*John D. Feeley* argued the cause for appellant (*Fox and Fox* and *La Rocca, Feeley & Associates,* attorneys; *Steven J. Kaflowitz,* on the brief).

*Eileen Schlindwein DenBleyker,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General of New Jersey, attorney; *Lewis A. Scheindlin,* Assistant Attorney General, of counsel; *Jeff S. Ignatowitz,* Deputy Attorney General, on the brief).

Justice LONG delivered the opinion of the Court.

On this appeal, we revisit our recent opinions in *Richardson v. Board of Trustees, Police and Firemen's Retirement System,* 192 *N.J.* 189, 927 *A.*2d 543 (2007), and *Patterson v. Board of Trustees, State Police Retirement System,* 194 *N.J.* 29, 942 *A.*2d 782 (2008), which addressed the standards applicable to accidental disability pensions. In *Richardson,* we explained that to be eligible to

collect accidental disability benefits, a claimant must show each of the following:

1. that he is permanently and totally disabled;
2. as a direct result of a traumatic event that is
 a. identifiable as to time and place,
 b. undesigned and unexpected, and
 c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
4. that the disability was not the result of the member's willful negligence; and
5. that the member is mentally or physically incapacitated from performing his usual or any other duty.

[*Richardson, supra,* 192 *N.J.* at 212–13, 927 *A.*2d 543.]

Thereafter, in *Patterson,* we affirmed that a mental disability arising out of a pure mental stressor with no physical impact can qualify a member for accidental disability benefits so long as the member satisfies the *Richardson* criteria and, in addition,

[t]he disability must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person. By that addition, we achieve the important assurance that the traumatic event posited as the basis for an accidental disability pension is not inconsequential but is objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury.

[*Patterson, supra,* 194 *N.J.* at 34, 942 *A.*2d 782.]

In this case, the member, a policeman, was involved in a terrifying fire rescue in which he was injured and the victim died. He applied for accidental disability benefits and, according to the Board of Trustees of the Police and Firemen's Retirement System (Board), satisfied *Richardson* and experienced a *Patterson*-type horrific event. Despite that, the Board denied accidental disability benefits on the ground that, although the member experienced a qualifying "horror-inducing event," the event was "inconsequential" and "not objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." That determination, which was affirmed by the Appellate Division, was an improper application of *Patterson,* in which we declared that a

qualifying traumatic event is, in itself, objectively capable of causing a reasonable person to suffer permanent mental injury. *Ibid.* Thus, the Board erred in denying the member accidental disability benefits.

## I.

In 2001, Gregory Russo joined the Montclair Police Department. As a new recruit, he received training at the Essex County College Police Academy (Academy). After Russo graduated from the Academy, he was assigned to the Patrol Division of the Montclair Police Department. Russo worked the midnight shift and described his general duties as traffic stops and enforcement, responding to domestic disturbances, and crowd control.

In the early morning of November 29, 2001, while Russo was still in his first year on the force, he and Prentis Thompson, his partner and senior officer, responded to a reported house fire. Two other officers met them at the scene. The fire department had yet to arrive. The officers were informed by a crowd gathered in front of the burning home that people remained inside. Upon Thompson's order, the officers proceeded into the burning structure.

Once inside, the officers were able to locate three individuals, an adult and two children, on the first floor. They successfully escorted the individuals to safety. Russo walked them as far as the threshold before he and the others turned back into the home to rescue a man trapped on an upper floor. The officers were aware of the victim, not only because his daughter told them of his presence, but also because they could hear him coughing and crying out for help. The officers, however, could only proceed as far as the second floor landing; the intense heat and smoke prohibited them from advancing further. At that point, Russo became disoriented and started to feel dizzy and nauseous.

The fire department arrived during the attempted rescue. The firefighters entered the home, found the officers on the landing, and escorted them out of the building. Once outside, Russo and

the others received first aid. Russo later received treatment for smoke inhalation at Mountainside Hospital, where he remained overnight.

Unfortunately, the victim died in the fire. While Russo was outside the house, he witnessed the firefighters remove the victim from a window and lay him on the front lawn. The man's family then confronted Russo, blaming him and the other officers for the victim's death.

Russo did not immediately return to work, taking two to three weeks off. When he returned, he experienced difficulty coping with the aftermath of the fire, despite receiving numerous awards for his bravery. Russo reported difficulty sleeping, stomach disorders, and suicidal thoughts. He had problems performing at work and used his sick time in order to avoid police contact. Russo also experienced a change in his personality—he became introverted, depressed, and short-tempered, particularly with the public. His supervisors reprimanded him for his behavior.

Following the fire, Russo sought medical treatment. He was diagnosed with Post–Traumatic Stress Disorder (PTSD) [1] by his family doctor who prescribed Zoloft. He received further treatment from a psychologist, who administered bio-feedback treatment. Russo also underwent counseling with Dr. Arthur Weiner,

---

[1] PTSD is described as the

> development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity; or witnessing an event that involves death, injury, or a threat to the physical integrity of another person; or learning about unexpected or violent death, serious harm, or threat of death or injury experienced by a family member or other close associate.
>
> [American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders Text Revision* 463 (4th ed. 2000) (DSM–IV–TR).]

The affected person's response includes feelings of "intense fear, helplessness, or horror." *Ibid.* The characteristic symptoms of PTSD include "persistent reexperiencing of the traumatic event . . ., persistent avoidance of stimuli associated with the trauma and numbing of general responsiveness . . ., and persistent symptoms of increased arousal. . . ." *Ibid.*

who confirmed the diagnosis of PTSD. Russo was again prescribed Zoloft by another doctor, as well as Klonopin, Xanax, and Trazodone to treat his symptoms.

Russo filed an application for accidental disability retirement benefits with the Board on December 23, 2004. Following the application, the Board's expert, Dr. Howard Layman, evaluated Russo. He diagnosed Russo with PTSD, finding him "totally and permanently disabled" as a result of the November 29, 2001, "traumatic incident."

On May 9, 2005, the Board denied Russo's application for accidental disability benefits based on its finding that Russo's experience during the house fire was not a "traumatic event" as envisioned by *N.J.S.A.* 43:16A–7. The Board, however, found that the fire disabled Russo and that he was unable to perform his regular and assigned duties. As a result, the Board granted him an ordinary disability pension ("ordinary disability").

Russo appealed, requesting a hearing before an Administrative Law Judge (ALJ) and asserting that his disability was the result of a traumatic event. The case was referred to the Office of Administrative Law and proceeded to a hearing before ALJ Diana Sukovich on September 15, 2006, and May 15, 2007. The hearing most prominently featured Russo's description of the details of the fire and his ensuing traumatic response. Russo testified that the fire produced heavy smoke and incredibly intense heat: "The heat was all over. It felt like my ears were going to come right off my head, they felt like they were melting. It hurt to breathe, I could feel it everywhere." Russo also described his emotions when he got to the second floor landing and realized that he could not proceed any further:

> I was terrified. I—I couldn't—I couldn't believe that I was just—I felt like I just got hit by a truck, like I couldn't believe this was happening. I never—never wanted to be a fireman, never wanted to be put in—you know, I never would've imagined myself being put in this kind of a situation. The heat was incredible, I couldn't—it was becoming—the situation became increasingly harder to breathe, the heat and the smoke just kept getting worse.

Russo testified that when the firefighters found him he was disoriented and completely numb—"I was dizzy, nauseous, couldn't breathe, I couldn't see." The heat was so severe that it singed Russo's uniform. He testified:

> Q: ... You stated that the victim's daughter or family began yelling at you, do you recall what they were saying?
>
> A: Yeah, they kept saying, "You killed him. You killed him. You let him die. You let him die."
>
> Q: How did you feel at the time?
>
> A: I was so ashamed. I couldn't even look at her. I just tried tuning out the words. I could see your mouth moving, I just—
>
> Q: How did you feel physically?
>
> A: Just beaten. I—completely numb. I don't know how else to describe it.

In addition to the symptoms described above, including avoidance, suicidal thoughts, and a change in personality, Russo testified that he had trouble sleeping after the fire and had frequent nightmares: "Commonly I can hear the man in my dream crying, I can hear him coughing, just like it was at the fire and I—and I go back there, very common."

Russo also presented the testimony of Dr. Weiner, who was offered as both an expert and a fact witness. Dr. Weiner related his counseling sessions with Russo as well as the basis for his diagnosis of PTSD. He noted that when he first met Russo, "he was extremely distressed." Dr. Weiner discovered later in their relationship, however, that he "underestimated [Russo's] suicidiality and the severity."

Dr. Weiner described the fire as a "very, very intense experience for Mr. Russo, more intense than most. He was tremendously ashamed of his performance, he had high expectations of what he could do, blamed himself a lot, he was very, very distressed, often tearful." Specifically, Russo blamed himself for the death of the victim.

In Dr. Weiner's opinion, the fire and the "attend[ant] events" were sufficiently traumatic to qualify Russo for accidental disability:

Q: So, two questions, just to recap. Once again, what was the uncontrolled force, in your opinion, that rendered Mr. Russo disabled?

A: The external uncontrolled force is the situation in the fire, the internal uncontrolled force is the biological cascade that the situation and the fire caused.

. . . .

A: The biological cascade, the biological evolutionary response, the survival response, that was triggered by this external event.

Dr. Weiner noted that individuals can react differently to objectively traumatic events. He posited the example of firefighters who "frankly love to run into buildings that are on fire, they're firemen and you can see that they're not going to have this experience, otherwise they're not going to be firemen." Dr. Weiner noted, however, that an individual's reaction to a fire as a traumatic event also depends on proximity to the fire itself:

If you're far away mostly not a strong reaction, but really, I mean, it depends how hot you are, whether you're burning and as you approach that it becomes very, very close to objective that someone whose clothes are on fire, okay . . . and who can't breathe and who can't see and whose gasping, okay, that's closer to objective. . . .

The fire, in Dr. Weiner's opinion, was an objectively traumatic event. The report of the Board's expert, Dr. Layman, which reached the same conclusion, was also admitted into evidence.

Russo presented Officer William Wilkes as an expert in police training and procedure. Wilkes was employed by the Township of Verona Police Department for approximately twenty-seven years, eventually holding the position of Chief of Police. He also served as the director of the Academy, where Russo received his training. The bulk of Wilkes's testimony focused on the amount of firefighting training police officers receive.

Wilkes concluded that police officers are *not* trained in firefighting tactics. Wilkes was also asked about the responsibilities a police officer undertakes when he reports to the scene of a fire:

Q: Chief, based on your experience and your opinion, does a police officer have an obligation to enter a burning structure to rescue individuals who may be trapped?

A: The simple answer to that question, sir, is no, there is no obligation for that officer to enter a burning structure. Additionally, the officer more than likely has not received any training to go into that particular hostile environment, if you will;

and second off, he or she does not have the type of equipment that would be required.

Wilkes reiterated throughout his testimony that firefighting is not within the training or expectations of a police officer. Wilkes noted, however, that police officers, including him, enter burning buildings when they feel it is necessary. Wilkes also described the "quasi military" environment of most police departments. He noted that when a senior officer commands a junior officer to perform a task, the junior officer's decision to obey is "automatic."

The ALJ reserved her decision until we decided *Patterson, supra,* 194 *N.J.* 29, 942 *A.*2d 782, which was by then pending before us. By the time the decision was issued, however, she had retired. Before another ALJ could be assigned, the Board reconsidered Russo's case on June 9, 2008. In a letter addressed to Russo's attorney, the Board denied Russo accidental disability benefits. The Board recognized that the house fire was "identifiable as to time and place and is undesigned and unexpected and caused by a circumstance external to the member and not the result of preexisting disease that is aggravated or accelerated by the work." In addition, the Board found that Russo was "totally and permanently disabled from the performance of [his] regular and assigned duties and that the disability did result from direct personal experience of a terrifying or horror-inducing event that involved actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of [Russo] or another person."

Ultimately, however, the Board held "that the event that forms the basis for an accidental disability pension is inconsequential and is not objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." The Board thus found that the evidence did not satisfy the reasonable person standard announced in *Patterson.*

The matter was reassigned to ALJ Ken R. Springer. Both Russo and the Board agreed that the matter could be decided on the record previously established, in addition to supplemental

briefing following *Patterson.* The ALJ issued a decision on November 6, 2008, which concluded that Russo was eligible for an accidental disability pension.

Applying *Richardson* and *Patterson,* the ALJ concluded that the Board misapplied the reasonable person standard established in *Patterson.* Specifically, the ALJ noted the Board's concession that Russo's disability "did result from direct personal experience of a terrifying or horror-inducing event that involved actual or threaten[ed] death or serious injury, or similarly serious threat to the physical integrity of the member or another person." According to the ALJ, under that standard, the experiencing of a qualifying horrific event automatically satisfies the objective reasonable person criteria. In an abundance of caution, the ALJ went on to evaluate whether a reasonable person would, in fact, "be likely to suffer a disabling mental injury by exposure to the admittedly terrifying or horror-inducing event that Russo witnessed," and answered that question in the affirmative. In support of his holding, the ALJ noted that the act of an untrained person entering a burning building is itself "harrowing and frightful," and that it was reasonable for Russo, given the circumstances, to fear for his life and to suffer feelings of guilt and helplessness upon the death of one of the occupants.

The Board rejected the ALJ's decision. In support of that outcome, the Board adopted the ALJ's findings of fact but held that Russo did not satisfy *Patterson's* reasonable person standard. Most notably, the Board asserted that finding Russo's disability resulted from a "direct personal experience of a terrifying or horror[-]inducing event that involved actual or threatened death or serious injury" does not satisfy the reasonable person inquiry. Rather, the Board noted that "*Patterson* makes clear that an applicant for accidental disability benefits must encounter an 1) incident that is terrifying or horror-inducing 2) and that event must be objectively capable of causing a disabling mental injury to a reasonable person in similar circumstances."

In reaching its conclusion, the Board compared Russo's response to the experiences of the other officers. Like Russo, all officers left the home without incident and received first aid. According to the Board, the only difference between Russo's experience and the other officers' was that Russo was confronted with the victim's family members. The Board concluded that simply being "yelled at" does not "in and of itself . . . constitute a traumatic event." In addition, the Board held that it was unreasonable for a police officer, with no relation to the victim, to suffer "disabling feelings of guilt and helplessness." Thus, it concluded that Russo's feelings of guilt and remorse are not enough to cause a "reasonable police officer in similar circumstances to suffer a disabling mental injury."

Russo appealed and the Appellate Division upheld the Board's conclusion that he did not qualify for accidental disability benefits. Among the reasons advanced by the panel was that the other officers with Russo did not suffer disabling injuries and the confrontation with the family members was not a traumatic event.

We granted certification, *Russo v. Bd. of Trs., Police & Fireman's Ret. Sys.*, 204 *N.J.* 39, 6 *A.*3d 442 (2010), and now reverse.

## II.

Russo asserts that the Board's decision abrogates this Court's holding in *Patterson;* requires an "extra hurdle for applicants to overcome to obtain disability benefits"; fails to recognize that the "horrific" event qualifier, in itself, satisfies the "reasonable person standard"; and that he is entitled to accidental disability benefits.

The Board does not dispute the fact that Russo is permanently disabled. Rather, the core of the Board's argument is that *Patterson* was not satisfied because Russo was "disabled as a result of his idiosyncratic reaction to the death of" the victim. In support of that thesis, the Board asserts that Russo's disability was not the result of his experience in the burning home, but rather stems "from his feelings of guilt at failing to save the victim." In addition, according to the Board, Russo's life was not

threatened while he was in the home—he was not trapped inside and left the building without incident. Thus, as a trained "first responder[ ]," "simply entering and leaving a burning structure, without more, does not rise to the level" of a truly life-threatening situation. Ultimately, the Board concludes that Russo's "reaction was idiosyncratic and not objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury."

## III.

Our review of administrative agency action is limited. *In re Herrmann,* 192 *N.J.* 19, 27, 926 *A.*2d 350 (2007). "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." *Id.* at 27–28, 926 *A.*2d 350. However, because "questions of law are the province of the judicial branch," Steven L. Lefelt et al., 37 *New Jersey Practice: Administrative Law Practice* § 7.19 at 387 (2d ed. 2000), we are "in no way bound by an agency's interpretation of a statute or its determination of a strictly legal issue," *Mayflower Sec. Co. v. Bureau of Sec.,* 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973), particularly when "that interpretation is inaccurate or contrary to legislative objectives," *G.S. v. Dep't of Human Servs., Div. of Youth & Family Servs.,* 157 *N.J.* 161, 170, 723 *A.*2d 612 (1999); *see also,* Lefelt et al., *supra,* § 7.19 at 387 ("A court will not permit an agency's legal determination to stand if the court believes it to be error."). Like all matters of law, we apply *de novo* review to an agency's interpretation of a statute or case law. *Toll Bros., Inc. v. Twp. of W. Windsor,* 173 *N.J.* 502, 549, 803 *A.*2d 53 (2002). That is the applicable standard in this case.

## IV.

Accidental disability benefits are available to an employee upon written application provided that

the medical board, after a medical examination of such member, shall certify that the member is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties and that such disability was not the result of the member's willful negligence and that such member is mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him.

[*N.J.S.A.* 43:16A–7(1).]

Accidental disability differs from ordinary disability in several ways. For example, the accidental disability benefit is greater. *Compare N.J.S.A.* 43:16A–7(2)(b) (accidental disability benefits), *with N.J.S.A.* 43:16A–6(2)(b) (ordinary disability benefits). *See also Kasper v. Bd. of Trs. of the Teachers' Pension & Annuity Fund,* 164 *N.J.* 564, 573–74, 754 *A.*2d 525 (2000) (describing difference between ordinary and accidental disability). Moreover, ordinary disability only requires that the employee prove he is permanently "mentally or physically incapacitated for the performance of his usual duty and of any other available duty in the department which his employer is willing to assign to him." *N.J.S.A.* 43:16A–6(1). Thus, a member can qualify for ordinary disability benefits if he is disabled for any reason; the disability need not have a work connection. *Richardson, supra,* 192 *N.J.* at 195, 927 *A.*2d 543. Conversely, accidental disability requires the employee to demonstrate that he "is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his regular or assigned duties." *N.J.S.A.* 43:16A–7(1). In other words, the traumatic event must be work connected. *Richardson, supra,* 192 *N.J.* at 195, 927 *A.*2d 543.

It is the question of what constitutes a "traumatic event" that has dogged courts for generations. *See generally id.* at 196–209, 927 *A.*2d 543 (outlining history of traumatic event standard). Classically, "traumatic event" was purely physical and connoted the happening of an "accident" during the performance of the worker's duties. *Cattani v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 69 *N.J.* 578, 586, 355 *A.*2d 625 (1976).

That understanding of traumatic event provided the Appellate Division with a coherent standard that it was able to apply relatively consistently. *See, e.g., Pollara v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 183 *N.J.Super.* 505, 508–09 [444 *A.*2d 616] (App.Div.1982) (finding fall from fifth stair of stairway when handrail gave way traumatic event); *In re Carlson,* 174 *N.J.Super.* 603, 605 [417 *A.*2d 103] (App.Div.1980) (declaring slip and fall traumatic event); *Toma v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 172 *N.J.Super.* 76, 78–79, 84 [410 *A.*2d 1175] (App.Div.1980) (identifying litany of circumstances that qualified as traumatic events, including lacerations and being thrown to floor by violent inmate); *Titman v. Bd. of Trs., Teachers' Pension & Annuity Fund,* 107 *N.J.Super.* 244, 246 [258 *A.*2d 31] (App.Div.1969) (identifying rope-jumping episode in which teacher injured knee as traumatic event, but later episode where knee collapsed as a result of "degenerative arthritis" not traumatic).

[*Richardson, supra,* 192 *N.J.* at 204, 927 *A.*2d 543.]

As time went on, courts began to stray from that fairly straightforward template for workers' compensation purposes, and later for accidental disability. As a result, on-the-job heart attacks began to be swept into the accident rubric. *Id.* at 198, 927 *A.*2d 543. In response, the Legislature enacted *N.J.S.A.* 43:16A–7(4) which eliminated the aggravation of a pre-existing disease from the scope of the "traumatic event" language. *Id.* at 199, 927 *A.*2d 543.

With that legislation in mind, in *Kane v. Board of Trustees, Police & Firemen's Retirement System,* 100 *N.J.* 651, 498 *A.*2d 1252 (1985), the Court formulated a three-part test, imposing different requirements on accidental disability than had earlier case law, in an effort to refine the standard,

a worker must demonstrate (1) that his injuries were not induced by the stress or strain of the normal work effort; (2) that he met involuntarily with the object or matter that was the source of the harm; and (3) that the source of the injury itself was a great rush of force or uncontrollable power.

[*Id.* at 663, 498 *A.*2d 1252.]

Confusion over the *Kane* standard, especially the "great rush of force or uncontrollable power" immediately ensued:

despite their best efforts, courts remained unable to deploy it to reach consistent results. *Compare Fawcett v. Bd. of Trs., Pub. Employees' Ret. Sys.,* 307 *N.J.Super.* 378 [704 *A.*2d 1041] (App.Div.1998) (holding whiplash from malfunction of seat which lurched backward and forward was great rush of force), *with Pino v. Bd. of Trs., Pub. Employees' Ret. Sys.,* 309 *N.J.Super.* 112 [706 *A.*2d 793] (App.Div.) (concluding whiplash from bus being rear-ended and driver being thrown forward into steering wheel and back against seat not great rush of force), *certif. denied,*

156 *N.J.* 380 [718 *A*.2d 1209] (1998); *compare also Duignan v. Bd. of Trs., Pub. Employees' Ret. Sys.,* 223 *N.J.Super.* 208 [538 *A*.2d 432] (App.Div.1988) (holding invasion of broom bristles in sensitive organ like eye can be great rush of force), *with Caminiti v. Bd. of Trs., Police & Firemen's Ret. Sys.,* 394 *N.J.Super.* 478, 481 [927 *A*.2d 560] (App.Div.2007) (holding finger "deeply stuck" by hypodermic needle in suspect's pocket did not satisfy standard). Indeed, the Appellate Division itself has noted its dilemma:

> With all of the shortcomings of [the traumatic event] standard in establishing a fairly ascertainable gauge for determining eligibility for accidental disability pension benefits, and even granting that the judicially crafted three-prong test for satisfying the "traumatic event" standard provides no uniformly workable basis for confidently predicting the outcome in any typical case, we are not at liberty to depart from either.
>
> [*Caminiti, supra,* 394 *N.J.Super.* at 482, 927 *A*.2d 560 (citations omitted).]

[*Richardson, supra,* 192 *N.J.* at 208–09, 927 *A*.2d 543.]

Thus, in *Richardson* we provided a "course correction" to render the accidental disability standard workable. *Id.* at 210, 927 *A*.2d 543. In doing so, we declared that the "great rush of force or uncontrollable power ... is simply one example of the kind of happening that will satisfy the traumatic event standard, *but not the only example.*" *Id.* at 212, 927 *A*.2d 543 (internal quotation marks omitted). We stated:

> Under that shifted paradigm, a traumatic event is essentially the same as what we historically understood an accident to be—an unexpected external happening that directly causes injury and is not the result of pre-existing disease alone or in combination with work effort. Thus, to obtain accidental disability benefits, a member must prove:
>
> 1. that he is permanently and totally disabled;
> 2. as a direct result of a traumatic event that is
> a. identifiable as to time and place,
> b. undesigned and unexpected, and
> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
> 3. that the traumatic event occurred during and as a result of the member's regular or assigned duties;
> 4. that the disability was not the result of the member's willful negligence; and
> 5. that the member is mentally or physically incapacitated from performing his usual or any other duty.
>
> [*Id.* at 212–13, 927 *A*.2d 543.]

Subsequently, in *Patterson* we affirmed that "permanent mental injury caused by a mental stressor without any physical impact

can satisfy the [accidental disability] standard." *Patterson, supra,* 194 *N.J.* at 48, 942 *A.*2d 782. In ruling, we recognized that the so-called mental-mental category presents a unique set of challenges:

"In most physical disability claims, medical analysis quickly goes beyond the subjective statement by the patient to clinical and laboratory tests by the physician.... In psychiatric disability claims, by contrast, medical analysis to a greater degree is analysis of the subjective statement of the patient." *Saunderlin v. E.I. DuPont Co.,* 102 *N.J.* 402, 412 [508 *A.*2d 1095] (1986). Thus, in the context of psychological injuries, the proofs related to the traumatic nature of an event and the causal relationship between event and injury may be more problematic than in the case of a physical event. As a result the boards have expressed legitimate concerns about becoming bogged down in litigation over idiosyncratic responses by members to inconsequential mental stressors.

[*Id.* at 48–49, 942 *A.*2d 782.]

In response, we established a high threshold for the award of accidental disability benefits based on a mental injury arising out of a pure mental stressor with no physical impact. *Id.* at 50, 942 *A.*2d 782. Indeed, we required that the member's disability "must result from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." *Ibid.* We adopted that standard to assure the bona fides of claimed mental injuries and to ameliorate the problem of subjectivity inherent in mental claims. *Ibid.* As such, we denominated specific horrific events that would pass muster because they are of consequence and objectively capable of causing a reasonable person to suffer a disabling mental injury. *Ibid.* By way of example, we explained:

Under that standard a permanently mentally disabled policeman who sees his partner shot; a teacher who is held hostage by a student; and a government lawyer used as a shield by a defendant all could vault the traumatic event threshold.

By the addition of the latter requirements to the *Richardson* template, we assure that the traumatic event is objectively capable of causing a permanent, disabling mental injury to a reasonable person under similar circumstances.

[*Ibid.*]

In *Patterson,* we applied the new test in three separate cases. We held that Robert Patterson's allegation of disparagement by a superior officer could not vault the traumatic event threshold, *id.*

at 51, 942 A.2d 782, but that Glynn Moore's contention that he was subjected to death threats by other officers and Joseph Guadagno's claim that a gang member, who knew where he lived, had made a "credible threat" to rape and murder his wife and daughter, were traumatic events that could trigger accidental disability benefits if all other relevant standards were satisfied, *id.* at 51–53, 942 A.2d 782. We thus remanded *Moore* and *Guadagno* for further proceedings. *Id.* at 53, 942 A.2d 782.

Those dispositions reflect the way *Patterson* and *Richardson* were intended to operate. In a mental-mental case, *Patterson* is the threshold that must be met for further inquiry to be warranted. Satisfying *Patterson* eliminates the problem of "idiosyncratic responses by members to inconsequential mental stressors," *id.* at 49, 942 A.2d 782, insofar as the events described in *Patterson* are of sufficient gravity to objectively cause a permanent, disabling mental injury to a reasonable person, *id.* at 49–50, 942 A.2d 782. *See also DSM–IV–TR, supra,* at 467 (recognizing causal relationship between certain delineated traumatic events and resultant mental disorders, in particular, PTSD). Where no qualifying traumatic event occurs, the potential for a mental-mental accidental disability benefit is eliminated. To the contrary, where a qualifying horrific event is experienced, *Patterson* is satisfied with no further analysis. It is then that *Richardson* comes into play.

It is under *Richardson* that the member who has experienced a qualifying traumatic event must prove that the event, *in fact,* caused him to be permanently and totally disabled; that it was identifiable as to time and place; undesigned, unexpected, and external to the member; that it was work related; not self-induced, and that the member is unable to perform his usual or any other duty. *Richardson, supra,* 192 *N.J.* at 212–13, 927 A.2d 543. That is important because it underscores that not every person who experiences a *Patterson*-type horrific event will automatically qualify for a mental-mental accidental disability benefit. To the contrary, a member who experiences a *Patterson*-type

horrific event and simply becomes upset will not satisfy the permanent and total disability standard. Likewise, one who has suffered long-standing psychiatric issues may fall short of the "direct result" standard. Similarly, an employee who experiences a horrific event which falls within his job description and for which he has been trained will be unlikely to pass the "undesigned and unexpected" test. Thus, for example, an emergency medical technician who comes upon a terrible accident involving life-threatening injuries or death, will have experienced a *Patterson*-type horrific event, but will not satisfy *Richardson's* "undesigned and unexpected" standard because that is exactly what his training has prepared him for.

## V.

Applying those standards, we have concluded that the Board went astray in this case in failing to recognize that once a member has experienced a qualifying incident—a "terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person"—the objective reasonableness standard of *Patterson* has been met and only the *Richardson* factors remain to be satisfied. *See Patterson, supra,* 194 *N.J.* at 50, 942 *A.*2d 782. That is to say that, in misapplying *Patterson's* objective reasonableness standard, the Board's interpretation of that standard was inaccurate, was contrary to the legislative objectives that standard embodies, and was clearly erroneous as a matter of law.

The Board should have recognized that Russo experienced a qualifying event insofar as he was ordered into a burning building so full of intense heat and smoke that his uniform was singed, that, as a police officer, he had no training or equipment for such an event, and that, in fact, he was hospitalized for smoke inhalation. The Board characterized that situation as "not life threatening" and thus not a *Patterson* trigger. That conclusion stands in contrast to the facts of record. Moreover, Russo clearly

satisfied the other *Patterson* standard with respect to which the Board is curiously silent; he experienced a terrifying event that presented "a serious threat to the physical integrity of another person"—the victim, who suffered while crying out for help that Russo was unable to provide and who ultimately died as a result of the fire. That experience also objectively satisfied *Patterson*, and there was no warrant for further inquiry on that subject. Taken in connection with the Board's *Richardson* findings, it is clear that Russo sustained his burden.

Although not necessary to the disposition of the appeal, we choose to add the following. At this late date, the Board appears to be suggesting, at least obliquely, that some of the *Richardson* factors were not satisfied. It contends, for example, that Russo's injury did not directly result from the horrific fire incident, but from "guilt feelings" over the victim's death. In addition, it suggests that Russo's training as a "first responder" somehow rendered what occurred not "unexpected."

As the facts that we set forth initially underscore, there is no record support for those contentions. The Board's own expert concluded that Russo was totally disabled as a result of the fire, as did Russo's expert. The same is true of the "first responder" claim. The only evidence adduced at the hearing was that Russo was trained and equipped as a police officer, not as a firefighter.

Here, what occurred was that Russo, a newly-minted police officer, with no psychiatric history, completely untrained and unequipped for firefighting, was ordered into a burning building and, with his fellow officers, bravely rescued three of the four occupants. The intensity of the fire terrified and disoriented Russo, singed his uniform, and sent him to the hospital overnight for smoke inhalation. One person in the house, who cried out for help to Russo and his fellow officers, could not be reached because of the fire's ferocity and perished. Thereafter, the victim's family heaped scorn on Russo and blamed him for their relative's death. It was as a result of the fire and the confluence of events it generated, including the death of the victim and the relatives'

accusations, that Russo was rendered permanently mentally disabled. Those circumstances plainly satisfied both *Patterson* and *Richardson* and, in our view, are exactly what the Legislature had in mind when it enacted the accidental disability statutes.

## VI.

The judgment of the Appellate Division is reversed. The case is remanded to the Board for the processing of Russo's accidental disability award.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO, HOENS and STERN—7.

*Opposed*—None.