**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0751-20

IN THE MATTER OF THE
SUSPENSION OR REVOCATION
OF THE LICENSE OF MARIE
KHATELINE FLEURANTIN, RN,
RN #26NR06722700,
TO PRACTICE NURSING IN
THE STATE OF NEW JERSEY.

_____

Submitted March 16, 2022 – Decided July 28, 2022

Before Judges Accurso, Rose and Enright.

On appeal from the New Jersey Board of Nursing, Division of Consumer Affairs, Department of Law and Public Safety.

Marie Khateline Fleurantin, appellant pro se.

Matthew J. Platkin, Acting Attorney General, attorney for respondent New Jersey Board of Nursing (Sookie Bae-Park, Assistant Attorney General, of counsel; Cristina E. Ramundo, Deputy Attorney General, on the brief).

PER CURIAM

Marie Khateline Fleurantin appeals on her own behalf from a final order of the New Jersey Board of Nursing revoking her nursing license because "she is incapable, for medical or other good cause, of discharging the functions of a nurse in a manner consistent with the public's health, safety and welfare" and imposing $31,000 in attorney's fees and costs of the proceeding. We affirm, essentially for the reasons expressed in the Board's thorough and thoughtful September 21, 2020 decision.

Fleurantin was licensed as a registered nurse in New Jersey in 1987. She last worked as a nurse in 2013. She came to the attention of the Board in 2018 following its and the Attorney General's receipt of nearly two dozen letters from Fleurantin about the way her name was written on her license, claiming "[v]ariations of [her] name [were] being entered . . . to frame [her] for identity theft" in order "to absolve those who have committed crimes against [her]." Fleurantin alleged she and her family had been stalked and harassed by government officials, gang members, and former employers. Some of the letters detailed how she had been subject to individuals drilling into her teeth to insert doses of mercury and that "[d]evices and chemicals" were being used against her and members of her family "to disfigure us and to alter neurotransmitters in our body so that they can label us crazy."

A-0751-20

At an informal investigative inquiry conducted by a committee of the Board in July 2018 to inquire about the correspondence, Fleurantin was asked why she believed someone would do those things to her. Getting emotional, Fleurantin said it was "[b]ecause it is alleged that I am not an RN." She told the committee she wasn't there to save her license, "I'm trying to save my life here. I'm trying to save the life of my children." Fleurantin explained "[s]omebody alleged that I am not a registered nurse and I'm trying to prove that I am to . . . move this cloud over my head so that those, those who are retaliating against me would let me go free."

At the end of that proceeding, the committee renewed the Board's request from several months earlier that Fleurantin undergo a mental health evaluation. Although having previously refused, she then agreed to do so, but never did. Instead, she sent a new barrage of correspondence to the Board and the Attorney General's office, including one letter alleging the Board had used "[b]lue light irradiation, irradiation with red and infrared laser light, optical radiation, with LED light emitting devices to induce diseases" against her at the investigative inquiry.

Three months after that informal inquiry, the Attorney General filed a verified complaint and order to show cause seeking to temporarily suspend

3

Fleurantin's nursing license. The State asserted Fleurantin's letters and emails were "highly erratic and disturbing" and indicated "she [was] presently impaired in a manner that [would] likely continue to impair her ability to practice nursing with reasonable skill and safety in violation of N.J.S.A. 45:1-21(i) and (l)." Following a hearing Fleurantin elected not to attend "for [her] safety," the Board temporarily suspended her license pending final adjudication of the allegations in the State's complaint.

The case was transferred to the Office of Administrative Law for a hearing in December 2018. Nearly a year later, following an in-person status conference in anticipation of the scheduled hearing, Fleurantin wrote to the administrative law judge that she was "cancelling the hearing" based on, among other things, the deputy attorney general engaging in fraud by tampering with evidence in the form of plaintiff's marriage certificate, baptismal certificate, immigration and social security records and changing her full name of Marie Khateline Fleurantin to Marie K. Fleurantin.

Fleurantin maintained she did not have "a middle initial follow[ed] by a period as a full middle name," although acknowledging "a middle initial represents a full middle name not spelled out." She denied having schizophrenia or bipolar disorder, as "these diagnoses are made between the

4

ages of 15-25 years old," and claimed she was evaluated by a doctor designated by the Immigration and Naturalization Service in 1983, who determined she did not "have mental illness." Fleurantin claimed "[a]ny report alleging otherwise [is] made up." Declaring "[t]he State has no longer the power to force upon me a name to use," she closed her letter saying "[t]he State of New Jersey and the Division of Law can keep their license."

The ALJ deemed Fleurantin "to have withdrawn her opposition to the revocation of her license" and to have "effectively conceded that she shall not be licensed" and dismissed the contested case based on her "withdrawal from the proceedings." In January 2020, the Board rejected the initial decision, retained jurisdiction, and elected to conduct its own hearing.

At the hearing, the State opened by summarizing the history of the matter and Fleurantin's vast correspondence to various State offices and expressing the Attorney General's concern that Fleurantin had "failed to go for an assessment and receive treatment for what [the State] believe[s] is a mental illness at this point." In her opening statement, Fleurantin denied any mental illness and contended the Board was being manipulated and lied to and that her license was suspended without legal process "so that my employer can get federal funding." She argued "corporate greediness" was behind them "telling

A-0751-20

the Board that I have mental illness, to suspend my license and to make me pay illegally." She claimed the Board's investigation "is a cover-up," that "[s]omething is not right and I am not the problem, someone else is, and that's all I have to say."

The State moved into evidence 286 pages of correspondence from Fleurantin from 2013 through January 2020 "wherein [she] describe[d] the sinister plots against her" and the report of its expert, Dr. Jacqueline Rondeau. Dr. Rondeau, a clinical psychologist, testified the correspondence from Fleurantin as well as the transcript of the investigative inquiry revealed redundant themes of persecutory ideation. Although Dr. Rondeau concluded the correspondence demonstrated Fleurantin was "suffering persecutory delusional thinking" and was not "in touch with reality to a significant degree," which she claimed "would be a characteristic of several major psychiatric or neuropsychiatric disorders," Dr. Rondeau declined to "draw[] a diagnosis of any schizophrenia, bipolar or any other disorders" because Fleurantin had declined to be evaluated. Instead, she opined that allowing Fleurantin to return to the practice of nursing prior to having a psychological evaluation would pose a risk of harm to the public.

A-0751-20

Fleurantin testified she was a competent nurse, caring of her patients and not afflicted with any mental illness. She noted she'd been in a stable marriage to her husband, a doctor certified in emergency medicine, since 1982, and that they'd raised three daughters, all with advanced degrees, including from Ivy League schools. She testified she speaks three languages, and she and her husband "are good people." She claimed she would never "hurt or harm anyone." She expressed her belief that in transferring her records from Haiti to the States, her "name was entered with middle initial and somehow somebody is saying that Marie Fleurantin [and] Marie Khateline Fleurantin" are "not the same person somehow, I'm using someone's name, Marie Fleurantin, which it's not and this is absurd."

Fleurantin claimed someone "has been brain-washing" employees of the Board against her and expressed the belief that "it has to do with my employers and what they've been doing all along." She contended

> [s]omebody's been telling them she's not a nurse, she's
> not the owner of her degree, so what they do,
> everything that goes wrong at work, they say she did
> it. The person they accuse is not the nurse, is the one
> who did it. Fail inspection, she's responsible. The
> student didn't pass, she's responsible. So they are
> framing me for everything that is going wrong because
> someone has been telling them that I was not the
> owner of my degree.

7

After hearing the testimony, the Board issued a cogent and clear decision revoking Fleurantin's license. After detailing the procedural history of the matter, reviewing the documents admitted in evidence and recapping the testimony, the Board found Dr. Rondeau a credible, qualified expert witness, noting she "provided the psychological vocabulary for what was patently obvious to any person reading [Fleurantin's] correspondence," namely, that her "communications are fraught with examples of defects or disturbances in her thought process, perception, cognition, insight, and judgment, all of which are core functions required in nursing." The Board agreed Fleurantin's "delusional communications manifestly demonstrate that she is suffering from symptoms of a mental health issue," and her "steadfast denial of mental illness is belied by her own emails, letters, and testimony."

The Board found Fleurantin's "grandiose belief" that "people are against her is far and wide and includes family, friends, relatives, and in-laws who are working with governments, institutions, employers, politicians, and others to conspire against her," and her insistence "that 'retaliations' are happening because of differences in the way her name appears on different documents provides another example of her disconnect with reality."

8

A-0751-20

The Board concluded Fleurantin's communications as observed by the

> Board and analyzed by the State's expert, demonstrate
> that she is suffering from symptoms of a mental health
> issue that erode her clear perception and judgment
> such that she is incapable, for medical or other good
> cause, of discharging the functions of a nurse in a
> manner consistent with the public's health, safety and
> welfare pursuant to N.J.S.A. 45:1-21(i).

Noting it had attempted to have Fleurantin voluntarily agree to a comprehensive mental health evaluation for over two years, that she had not practiced as a nurse since 2013, and had no plans to resume doing so, but refused to undergo an evaluation or participate in the Board's designated intervention program, the Board found it had no choice but to revoke her license.

The Attorney General's office sought its costs of $63,808 in prosecuting the case, including $7,700 in expert fees, and $56,108 in attorney fees. Fleurantin objected, arguing "she would be unable to pay the costs" and "was a nice person" who didn't deserve to have her license revoked. She maintained the State should pay her for all the anguish it had caused. Although Fleurantin had been advised the State would seek costs if successful and she would need to provide her three most recent tax returns in order to argue an inability to

pay, she brought only her most recent tax return. The Board was prepared to accept the document, but Fleurantin ultimately refused to turn it over.

The Board pointed out that "[c]osts are traditionally imposed pursuant to N.J.S.A. 45:1-25 so as not to pass the cost of the proceedings onto licensees who support Board activities through licensing fees." It also noted that Fleurantin drove up the costs "by her barrage of communications over a period of years, all of which required review." Despite finding the experienced and well-prepared deputy attorney general's hourly rate of $260 reasonable and the hours expended justified, see Rendine v. Pantzer, 141 N.J. 292, 334-37 (1995), the Board cut the request in half, imposing only $31,000 in costs and fees in light of the "the unique procedural history" of the matter and "the basis for discipline (incapable due to medical or other good cause)."

Fleurantin appeals, raising eighteen separate issues for our consideration, but all only echoing the arguments she made to the Board and adding the award of attorney's fees and costs was error. In her sixty-five-page brief and several boxes of uncollated documents comprising her 757-page appendix, she argues "the man referred to as the 'attorney general'" has "intercepted" her "various letter[s] to certain entities, because [her] letters denounced inhumane practices against her due to the misinterpretation of her

A-0751-20

name." She contends the Attorney General used the Board's Recovery And Monitoring Program (RAMP) "as intimidation to coerce [her] into submitting to an evaluation to enter her name in the system as a mentally ill [person] and a drug addict." Fleurantin asserts she "has refused to be framed for the enrichment of corporations."

Our review of administrative agency actions is limited. Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011). We will not upset an agency's final quasi-judicial decision absent a "clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. 19, 27-28 (2007).

Applying those standards here, we are satisfied the Board carefully and conscientiously considered all of Fleurantin's arguments and properly revoked her license to practice nursing, essentially for the reasons expressed in its September 21, 2020 opinion. The decision was not arbitrary, capricious, or unreasonable, and it was supported by substantial credible evidence in the record. See In re Stallworth, 208 N.J. 182, 194 (2011).

We are also satisfied the Board fairly assessed Fleurantin the costs of the proceeding, albeit substantially reducing those costs in light of the basis of the revocation. See In re Polk License Revocation, 90 N.J. 550, 578 (1982)

11

(noting a reviewing court may set aside a sanction only "where it is satisfied that the agency has mistakenly exercised its discretion or misperceived its own statutory authority"). Our decision is without prejudice to the Board's discretion to entertain a motion by plaintiff to further reduce or eliminate the sanction — properly supported by objective proof, including but not limited to three years of her federal and State tax returns — based on her inability to pay.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0751-20