**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0652-22

MICHAEL LEONARDI,

      Petitioner-Appellant,

v.

BOARD OF TRUSTEES,
STATE POLICE RETIREMENT
SYSTEM,

      Respondent-Respondent.

_____

Argued March 5, 2024 – Decided May 6, 2024

Before Judges Mayer, Enright and Paganelli.

On appeal from the Board of Trustees of the State Police Retirement System, Department of the Treasury, SPRS No. xx4987.

Lauren Patricia Sandy argued the cause for appellant (The Law Offices of Lauren Sandy, LLC, attorneys; Lauren Patricia Sandy, of counsel and on the briefs).

Jakai T. Jackson, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Jakai T. Jackson, on the brief).

PER CURIAM

Petitioner Michael Leonardi appeals from a final agency decision by the Board of Trustees (Board), of the State Police Retirement System, finding he was not entitled to an accidental disability retirement (ADR) benefits under N.J.S.A. 53:5A-10(a). We affirm.

We glean the relevant facts and procedural history from the record. Leonardi was employed as a police officer in Washington Township from 2001 to 2004. In September 2004, he was hired by the New Jersey State Police (NJSP). Leonardi completed police academy training both to become a police officer and a trooper. At the academy, he was taught basic lifesaving measures, including CPR.

With the NJSP, Leonardi was a road trooper and assigned to various locations and assignments, as a Trooper I, II and III. In 2014, he became a detective. During his time with NJSP, Leonardi "responded to numerous—close to 500 or more—auto accidents, with roughly thirty to thirty-five of them [involving] fatal[ities]."

Leonardi explained when responding to an accident, officers usually arrived before medical services, so he typically would render emergency aid until medical services arrived. Thereafter, he would continue to administer CPR

2

if medical services requested. It was common for medical services to ask for police assistance.

On the morning of May 17, 2018, Leonardi was at the Netcong Station. At the same time, along Route 80 in Mount Olive, a school bus with forty-four passengers was involved in an accident with a dump truck. Reports came in over the radio regarding "a severe school-bus accident with numerous injuries and possible fatalities."

Leonardi immediately drove to the scene. He stated the scene of the accident:

> was horrific—the force of the impact of the dump truck hitting the bus ripped the bus off its axle, and there were children who had been ejected from the bus on the ground in the median of the highway and other children suspended upside down from their seatbelts inside the overturned bus frame.

Leonardi "heard children crying and screaming for their parents, and observed children and teachers with severed limbs, broken bones, bleeding, and other injuries." Troopers carried two unconscious female children to an ambulance. An emergency medical technician (EMT) attended to one of the children who "coded," but ultimately survived.

Leonardi assessed the other child, M.V. He was told "she had a faint pulse." The child was lifeless, with severe injuries and head trauma. Despite

3

her severe injuries, Leonardi provided chest compressions to M.V. "After ten to fifteen minutes of chest compressions, the EMT advised Leonardi to stop, but [he] continued for several more minutes." The EMT advised Leonardi that M.V. was dead and requested that he "black tag" her.

Leonardi then assisted in moving another child to an ambulance for transport to a hospital. He reassessed the scene, which included "bloody and injured children all over the place. Every child was screaming for help and for their parents."

Leonardi also "helped a trooper stabilize another child, who appeared to have internal injuries and broken limbs, and placed her on a backboard and into an ambulance." Further, "[he] attempted to comfort another child who . . . reach[ed] out and call[ed] to him." Leonardi bandaged the child's significantly bleeding head and sat him on the median guardrail until the child could be transported to the hospital.

Next, Leonardi returned to the ambulance and remained with M.V. Since the area was a crime scene, M.V. could not be left alone, and "as a father," Leonardi did not want to leave her. M.V.'s age and identity were disclosed to Leonardi, and he learned that the children in the bus were fifth and sixth grade students.

A-0652-22

In the ambulance, Leonardi "broke down" and advised others "he would be the one assigned to remain with M.V." He "prayed and apologized to her for not being able to save her." Leonardi stayed with M.V. for approximately three hours. During that time, he thought of her family and learned that M.V.'s twin sister was on another bus. Occasionally he opened the ambulance door, "to get air and a bottle of water." But because Leonardi had a daughter the same age as M.V., "[h]e became extremely protective of M.V."

Once "the NJSP Crime Scene Investigation North Unit arrived, [Leonardi] assisted another trooper in removing [M.V.] from the ambulance and photographing her injuries." "Leonardi remained with M.V. until the medical examiner arrived and removed her from the scene."

Thereafter, Leonardi "went to [an] area by the dump truck where [a teacher]'s body was located. Leonardi assisted a Crime Scene trooper in photographing" the teacher's body.

Then, "Leonardi just stood on the median and did not know what to do. His thoughts were racing, and he became almost numb to his surroundings." Not remembering where he parked his vehicle, Leonardi was driven back the to the Netcong Station. At the station he "washed as much blood off his hands and body as he could and helped detectives with the investigation." He stared at his

A-0652-22

computer screen and recognized "there was nothing else for him to do." He decided to go home and was driven back to the accident scene to retrieve his vehicle, "which he had not realized he left."

After arriving home, Leonardi remained outside in his vehicle for approximately an hour, "trying to process the scene and incident." Once inside he "took a shower to wash off the remaining blood." He could not watch television because coverage of the accident was on every channel. He experienced flashbacks of everything that occurred, had difficulty falling asleep, and kept envisioning M.V.'s lifeless body.

Following the accident, Leonardi applied for ADR benefits. By letter of September 25, 2019, the Board advised Leonardi it had "determined that [he wa]s totally and permanently disabled from his job duties due to his psychological condition." However, because the "incident was not undesigned and unexpected and [since] Leonardi's disability was not the direct result of the incident but was instead associated with a pre-existing condition," the Board denied his application.

Leonardi appealed from the Board's determination. The Board approved Leonardi's request for a hearing and transmitted the matter to the Office of Administrative Law. The Administrative Law Judge (ALJ) held hearings on

January 26 and February 16, 2021. On May 27, 2022, the ALJ issued an eighty-four-page opinion, concluding the event was not "undesigned or unexpected." She explained:

> law-enforcement officers are expected to encounter incidents such as "serious bodily injury to or the death of a juvenile." Thus, while the bus accident was unequivocally horrific, Leonardi responded to a catastrophic accident where he had to render aid and document a crime scene. While certainly there were several factors that made Leonardi's experience particularly traumatic, including the condition of the victims and his extensive interactions with M.V., who was his daughter's age, I [conclude] that the event was not undesigned and unexpected.

In addition, the ALJ found Leonardi did "not prove[] that the disability [wa]s not the result of a pre-existing disease aggravated or accelerated by the work." She explained:

> There [wa]s no dispute that an incident involving serious bodily injury or death to a child is particularly traumatic and horrific . . . . Even absent any prior psychological or psychiatric history, severe [post-traumatic stress disorder (PTSD)] might result, but given Leonardi's psychiatric and psychological history, including the prior references to PTSD, depression, and alcohol abuse, whether or not Leonardi's disability [wa]s the result of a pre-existing disease aggravated or accelerated by work effort cannot be determined from the record, especially in view of, but not limited to, the following: testimony that Leonardi's disability was an exacerbation or aggravation of pre-existing PTSD and alcohol-abuse disorder; . . . testimony that Leonardi's

7

PTSD [wa]s cumulative; that it cannot be conclusively established when [Leonardi was] treated . . . or for what; and that none of [Leonardi]'s expert witnesses had reviewed any prior medical records.

Accordingly, the ALJ was "constrained to [conclude] that the application for [ADR] benefits should be denied," and the Board's determination denying Leonardi's application for ADR benefits should be affirmed.

Thereafter, at its July 26, 2022 meeting, the Board considered: the ALJ's decision; all exhibits; Leonardi's exceptions; the Deputy Attorney General's (DAG) exceptions; and statements made by Leonardi and the DAG. The Board then adopted the ALJ's decision affirming its denial of the application.

In August 2022, Leonardi requested reconsideration of the Board's denial of his application. He argued the ALJ erred in "finding that the May 17, 2018 incident was not undesigned and unexpected" and by "not correctly apply[ing] the legal standard regarding causation." Three days later, Leonardi

supplemented his request for reconsideration, pursuant to an amendment to N.J.S.A. 53:5A-10[1] and N.J.S.A. 53:5a-10.2.[2]

In September 2022, the Board "affirmed the finding that the May 17, 2018 incident was not undesigned and unexpected." The Board also found "[b]ecause . . . Leonardi's application . . . was not denied solely on the basis of direct result,"

---

[1] N.J.S.A. 53:5A-10, in part, was amended effective July 29, 2022, to provide:

> A member with a pre[-]existing and asymptomatic condition that is rendered symptomatic as a direct result of a traumatic event occurring during and as a result of the performance of the member's regular or assigned duties may be eligible for an accidental disability retirement allowance, provided that the traumatic event is caused by a circumstance external to the member and is the substantial contributing cause of the member's permanent and total disability.

[2] N.J.S.A. 53:5A-10, in part, was amended effective July 29, 2022, to provide:

> A member with a pre[-]existing and asymptomatic condition that is rendered symptomatic as a direct result of a traumatic event occurring during and as a result of the performance of the member's regular or assigned duties may be eligible for an accidental disability retirement allowance, provided that the traumatic event is caused by a circumstance external to the member and is the substantial contributing cause of the member's permanent and total disability.

A-0652-22

reconsideration of his application should be denied under N.J.S.A. 53:5A-10 and -10.2.

On appeal, Leonardi argues the Board erred in denying his application because: (1) the accident was "undesigned and unexpected"; (2) his PTSD was not pre-existing; and (3) he qualified for ADR benefits in accord with new legislation. We disagree.

We begin our discussion with a review of the principles governing our analysis. "Our review of administrative agency action is limited." Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011) (citing In re Herrmann, 192 N.J. 19, 27 (2007)). "We recognize that agencies have 'expertise and superior knowledge . . . in their specialized fields.'" Hemsey v. Bd. of Trs., Police & Firemen's Ret. Sys., 198 N.J. 215, 223 (2009) (quoting In re License Issued to Zahl, 186 N.J. 341, 353 (2006)). Therefore, we will not "substitute [our] own judgment for the agency's, even though [we] might have reached a different result." In re Stallworth, 208 N.J. 182, 194 (2011) (quoting In re Carter, 191 N.J. 474, 483 (2007)).

For those reasons, we "ordinarily should not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or

unreasonable; or (3) the decision was not supported by substantial evidence" in the record as a whole. In re Virtua-West Jersey Hosp. Voorhees for a Certificate of Need, 194 N.J. 413, 422 (2008). "The burden of demonstrating that the agency's action was arbitrary, capricious or unreasonable rests upon the person challenging the administrative action." In re Arenas, 385 N.J. Super. 440, 443-44 (App. Div. 2006) (citations omitted).

"Generally, courts afford substantial deference to an agency's interpretation of a statute that the agency is charged with enforcing." Thompson v. Bd. of Trs., Teachers' Pension & Annuity Fund, 449 N.J. Super. 478, 483 (App. Div. 2017) (quoting Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 196 (2007)). "Such deference has been specifically extended to state agencies that administer pension statutes because a state agency brings experience and specialized knowledge to its task of administering and regulating a legislative enactment within its field of expertise." Id. at 483-84 (internal quotation marks and citations omitted). However, we are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Id. at 484 (quoting Richardson, 192 N.J. at 196). We "apply de novo review to an agency's interpretation of a statute or case law." Ibid. (quoting Russo, 206 N.J. at 27).

11

The State Police Retirement System provides for an ADR allowance. N.J.S.A. 53:5A-10(a). To qualify, the member must demonstrate he or she "is permanently and totally disabled as a direct result of a traumatic event occurring during and as a result of the performance of his [or her] regular or assigned duties." Ibid.

In Patterson, the New Jersey Supreme Court developed the standard for qualifying for ADR benefits when a member's claim is grounded on "a permanent mental disability as a result of a mental stressor, without any physical impact." Patterson v. Bd. of Trs., State Police Ret. Sys., 194 N.J. 29, 33 (2008).

The Court "mandate[d] a two-step analysis in cases in which a member claims permanent mental incapacity as a result of an exclusively psychological trauma." Mount v. Bd. of Trs., Police & Firemen's Ret. Sys., 233 N.J. 402, 426 (2018). In step one, the court determines whether the disability "result[ed] from direct personal experience of a terrifying or horror-inducing event that involves actual or threatened death or serious injury, or a similarly serious threat to the physical integrity of the member or another person." Patterson, 194 N.J. at 34. Second, the "traumatic event posited as the basis for an [ADR] pension [must] not [be] inconsequential but . . . objectively capable of causing a reasonable person in similar circumstances to suffer a disabling mental injury." Ibid.

12

"If the event meets the Patterson test, the court then applies the Richardson factors to the member's application."  Mount, 233, N.J. at 426 (quoting Russo, 206 N.J. at 32-33).  "That is important because it underscores that not every person who experiences a Patterson-type horrific event will automatically qualify for a mental-mental accidental disability benefit."  Russo, 206 N.J. at 32. Under Richardson, to receive ADR benefits, a claimant must prove:

> 1. that he is permanently and totally disabled;
>
> 2. as a direct result of a traumatic event that is:
>
>> a. identifiable as to time and place,
>>
>> b. undesigned and unexpected, and
>>
>> c. caused by a circumstance external to the member (not the result of pre-existing disease that is aggravated or accelerated by the work);
>
> 3.  that the traumatic event occurred during and as a result of the member's regular or assigned duties;
>
> 4. that the disability was not the result of the member's willful negligence; and
>
> 5.  that the member is mentally or physically incapacitated from performing his usual or any other duty.
>
> [Richardson, 192 N.J. at 212-13.]

Here, our focus is on <u>Richardson</u>'s requirement the "tragic event" was "undesigned and unexpected."

Satisfaction of the "undesigned and unexpected" factor requires an event "extraordinary or unusual in common experience" and not "[i]njury by ordinary work effort." <u>Richardson</u>, 192 N.J. at 201 (citation omitted). "The polestar of the inquiry is whether, during the regular performance of [the member's] job, an unexpected happening . . . occurred and directly resulted in the permanent and total disability of the member." <u>Id.</u> at 214.

As the Court noted in <u>Russo</u>, a member "who experiences a horrific event which falls within his [or her] job description and for which he [or she] has been trained will be unlikely to pass the 'undesigned and unexpected' test." <u>Russo</u>, 206 N.J. at 33. "Thus, for example, an [EMT] who comes upon a terrible accident involving life-threatening injuries or death, will have experienced a <u>Patterson</u>-type horrific event, but will not satisfy <u>Richardson</u>'s 'undesigned and unexpected' standard because that is exactly what his training has prepared him for." <u>Ibid.</u>

Nonetheless,

> <u>Russo</u> should not be construed to mean that the inquiry regarding whether an event is "undesigned and unexpected" is resolved merely by reviewing the member's job description and the scope of his or her

A-0652-22

training. In a given case, those considerations may weigh strongly for or against an award of accidental disability benefits. To properly apply the Richardson standard, however, the Board and a reviewing court must carefully consider not only the member's job responsibilities and training, but all aspects of the event itself. No single factor governs the analysis.

[Mount, 233 N.J. at 427.]

Therefore, in Mount, the Court considered the officer:

confronted a catastrophic accident at close range. He initially viewed a victim's arm hanging from the vehicle's window. Bystanders approached the vehicle demanding that [the officer] rescue the occupants. With no firefighting equipment except a small fire extinguisher, [the officer] faced the imminent threat of an explosion. Within moments, the car burst into flames. As [the officer] learned minutes later, the explosion "melted" the young victims' bodies into the interior of the vehicle.

[Ibid.]

The Court concluded the event was "undesigned or unexpected" despite "[b]y virtue of his job description, training, and prior experience, [the officer] could anticipate being called to accidents that were serious or even fatal. As his job description suggest[ed], in some circumstances [the officer] would be expected to remove victims from a damaged vehicle pending the arrival of medical personnel." Mount, 233 N.J. at 427.

15

Nonetheless, the Court held the "tragic event" was "undesigned and unexpected" because the officer "was not trained to combat, unassisted, an explosion of such magnitude experienced at such a close range. With no firefighting equipment or protective gear, [the officer] was helpless in the face of a terrible tragedy." Id. at 427-28.

In Russo, the Court held Richardson was "plainly satisfied" when:

> a newly-minted police officer, with no psychiatric history, completely untrained and unequipped for firefighting, was ordered into a burning building and, with his fellow officers, bravely rescued three of the four occupants. The intensity of the fire terrified and disoriented [the officer], singed his uniform, and sent him to the hospital overnight for smoke inhalation. One person in the house, who cried out for help to [the officer] and his fellow officers, could not be reached because of the fire's ferocity and perished. Thereafter, the victim's family heaped scorn on [the officer] and blamed him for their relative's death. It was as a result of the fire and the confluence of events it generated, including the death of the victim and the relatives' accusations, that [the officer] was rendered permanently mentally disabled.
>
> [Russo, 206 N.J. at 34 (emphasis added).]

Under other circumstances the Court has held a "tragic event" was not "undesigned and unexpected." In Mount, the Court also considered the ADR benefits application of a hostage negotiator who claimed permanent disability "when a lengthy hostage negotiation ended with the shooting death of the

16

hostage-taker, as [the hostage-taker and negotiator] spoke by cellphone." Mount, 233 N.J. at 408. The Court concluded the negotiator "directly and personally experienced a terrifying or horror[-]inducing event," satisfying Patterson. Id. at 429. However, the Court concluded the shooting was not "undesigned and unexpected" because of the direct "sequence of events that led to [the] death." Id. at 431. The Court considered: (1) the negotiator's training and knowledge of police tactics; (2) that "it was readily apparent . . . a violent encounter could occur"; (3) the hostage-taker told the negotiator "the situation would end with the [hostage-taker's] death"; and (4) the hostage-taker's "statements and conduct portended a violent confrontation with police." Id. at 430. In other words, there was nothing "undesigned or unexpected" about the "tragic event."

We apply these well-established principles to the matter here, and affirm. We are satisfied the ALJ's decision that the event was not "undesigned and unexpected," and the Board's subsequent adoption of that decision, were based on "sufficient credible evidence on the record as a whole." R. 2:11-3(e)(1)(D). While in no respect minimizing the horrific event, the evidence failed to establish the event was "undesigned or unexpected."

17                                                                    A-0652-22

Here, Leonardi was alerted to "a severe school-bus related accident with numerous injuries." As he had done countless other times, Leonardi responded to the accident that included injuries and fatalities. Utilizing his training and experience, he assessed the scene; tended to the injured; assisted with crime scene photographs; and, because it was a crime scene, stayed with the body of a deceased child for hours. In short, because Leonardi was trained and experienced through his employment to assist accident victims, the school bus accident was not "undesigned or unexpected."

We commend Leonardi for his professionalism and compassion in caring for multiple accident victims, and are sympathetic to his mental condition, but under the circumstances presented before us, we have no basis to disturb the Board's determination that he did not satisfy the "undesigned and unexpected" requirement of Richardson.

To the extent we have not addressed Leonardi's remaining arguments, it is because either our disposition makes it unnecessary, or because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION