**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5106-18
A-5108-18

IN THE MATTER OF
WILLIAM ABLE,
CITY OF NEWARK.

_____

Argued May 11, 2021 – Decided June 14, 2021

Before Judges Yannotti, Mawla and Natali.

On appeal from the New Jersey Civil Service Commission, Docket Nos. 2016-1907 and 2018-3594.

Benjamin Clarke argued the cause for William Able, appellant in A-5106-18, respondent in A-5108-18, (DeCotiis, FitzPatrick, Cole & Giblin, LLP, attorneys; Benjamin Clarke, Alexander Hemsley, III, and Troy M. Stackpole, on the briefs).

Bernard Mercado, argued the cause for Newark Board of Education, respondent in A-5106-18, appellant in A-5108-18, (Office of General Counsel, attorney; Brenda C. Liss, of counsel and on the briefs; Bernard Mercado, on the briefs).

Jonathan S. Sussman, Deputy Attorney General, argued the cause for respondent New Jersey Civil Service Commission (Gurbir S. Grewal, Attorney General, attorney; Sookie Bae, Assistant Attorney General, of

counsel; Jonathan S. Sussman, on the brief and statement in lieu of brief).

PER CURIAM

These appeals, which we consider back-to-back and have consolidated for the purpose of writing a single opinion, relate to two Civil Service Commission (CSC) final agency decisions that reinstated William Able to his position as head custodian at Barringer High School in Newark but denied him back pay. We affirm the CSC's decision reinstating Able but reverse in part its decision denying entirely Able's back pay request and remand for further proceedings.

In A-5108, the Newark Board of Education (Board) challenges an April 6, 2018 CSC decision upholding the modification of Able's termination to a six-month suspension. The Board maintains the CSC's decision was arbitrary, capricious, and unreasonable as contrary to applicable law and the record evidence. It also contends the decision is inconsistent with principles of progressive discipline.

In A-5106, Able argues the CSC's June 12, 2019 determination denying him a back pay award was unreasonable because the CSC failed to follow its own regulations and refused to credit uncontested evidence in the record regarding his good faith mitigation efforts. Able also argues the CSC ignored applicable caselaw and statutory authority.

We have considered the parties' contentions in the context of the record and the applicable legal principles. For the following reasons, we affirm the CSC's decision to suspend, rather than terminate, Able from his head custodian position. We reverse in part the CSC's determination that Able was not entitled to back pay for any portion of the approximate two-and-a-half-year period between his improper termination and reinstatement, and conclude the CSC erred when it denied Able back pay for the ten-weeks between the CSC's April 6, 2018 decision and his June 18, 2018 reinstatement. Apart from this period, we affirm the CSC's decision denying Able's back pay request for the remaining approximate twenty-four months.

I.

To provide context for our decisions, we provide an extended discussion of the procedural history and facts, derived from the administrative record, including testimony provided during the February 16, 2017 and May 5, 2017 hearings. Effective September 16, 2015, Able was terminated from his position as senior custodian at Barringer High School in Newark due to an incident that occurred on September 7, 2015, when Able permitted his uncle and children to remove unsalvageable metal lockers from school property.

A-5106-18

On November 19, 2015, the Board issued a final notice of disciplinary action (FNDA) removing Able from his job for conduct unbecoming a public employee, misuse of public property, and other sufficient cause. Able appealed the FNDA, and the matter was transferred to the Office of Administrative Law for a determination as a contested case.

At the hearing, Able testified regarding the circumstances surrounding his dismissal. He stated that in August 2015, he spoke with Carrieann Zielinski, Barringer High School's Operations Manager, about removing old lockers located on the first floor of the school because a majority of the lockers were broken and would not stay completely shut. Able stated that students would slam the locker doors and use them as trash receptacles. The lockers were also believed to have exacerbated a rodent infestation problem.

Zielinski agreed and told Able that she would inform Keith Barton, Barringer High School's Executive Managing Director of Operations, to let him know the lockers were being removed. Able and Esther Williams, another Barringer High School custodian, removed approximately 200 lockers over a period of two to three days.

Once the lockers were removed, Able determined that some were salvageable and placed them in Barringer's boiler room for use as storage. He

4

moved the remaining damaged and unsalvageable lockers and positioned them outside the school against a fence for later disposal.

On September 7, 2015 Able, along with his uncle and several of his children, were seen on the school's video surveillance removing certain of the discarded lockers and placing them in a gray work van. Able acknowledged that the lockers placed in the van were not the same lockers stored along the fence. He clarified that the lockers placed along the fence were the "first set," and that he did not know what, if anything, happened to them.

Approximately a week later, Barton reviewed the September 7, 2015 video surveillance footage and placed Able on administrative suspension. At the time of Able's suspension, the Board had written policies in place that addressed the disposal of "fixed assets." Barton stated that according to the policy, fixed assets included furniture, smart boards, computers, or "anything that the school purchases that . . . has some sort of useful life." Moreover, Barton stated that senior custodians are required to know the fixed asset policy.

The policy stated that before a fixed asset could be removed, a memo was required to be sent to the building administrator that included "the complete description of the item and a brief description of the condition and use of the equipment." It further provided that after "receipt of the memo from the

5

requisitioner, appropriate steps [would] be taken by the building administrator or his/her designee for proper disposal of the equipment." In addition, the policy provided that "[i]n no instance should equipment be moved from a department or disposed of without prior consent by the building administrators and notification to the fixed asset supervisor."

Able testified that he was not aware of any policy that "prohibit[ed] employees from taking stuff that's going to be discarded." Instead, it was his understanding that he only needed approval from a supervisor to dispose of items that had a barcode on it, otherwise, it was up to the employee's discretion on how best to dispose of the items. Williams similarly testified that custodians were permitted to use their discretion in the disposal of items unless it had a barcode.

Zielinski stated that she emailed Barton on September 1, 2015, to notify him about a large quantity of garbage Able discovered after he removed the lockers. The email also provided that Zielinski "would prefer if the lockers were removed permanently." Zielinski stated, however, that she did not authorize Able "to take the lockers with him." Further, the record reveals that Able did

not receive permission from Principal Mincy or Principal Dr. Breedlove[1] to "take building material out of the school."

Able admitted that with the assistance of his uncle and children, he removed the lockers from the school. Able explained, however, that he did not consider his actions to be stealing:

> Well, I would say that it's not stealing because [the lockers] . . . were going to the dumpster. That's what I would say. If they . . . were good and they were going to be placed, you know, somewhere else, then I would say, yeah, then I stole them. But, in my mind, they were . . . a few feet from the door. And they were, you know they were garbage. So, they were going . . . to the garbage anyway.

Able also acknowledged that he did not inform Barton or any supervisor when he was confronted about the September 7, 2015 incident that his children and uncle had helped him remove the lockers. He explained he:

> [C]ouldn't tell them anything. Because like I said, when they came there, after the incident, when they came there, nobody spoke to me. The first time somebody talked to me, when they were calling me up to the security room, and everybody's yelling this and yelling that . . . [e]verybody just accusing. So, I never had a chance to tell them what happened because nobody ever asked.

---

[1] Neither Principal Mincy nor Principal Dr. Breedlove's first names are indicated in the record.

At the conclusion of the February 16, 2017 hearing, Able's counsel requested that the Board "at least allow [him] to work in order to mitigate his damages," which Administrative Law Judge (ALJ) Leland S. McGee denied. Approximately a year later, on February 12, 2018, ALJ McGee issued an initial decision finding that the Board had not met its burden of proving all the charges by a preponderance of the evidence.

The ALJ addressed each of the charges filed against Able. First, ALJ McGee found that Able did not engage in conduct unbecoming a public employee by discarding the lockers. The ALJ concluded that "there were no clearly established protocols for how to dispose of school property that was in disrepair" and "there was no formal training for the custodians with respect to disposal of school property." Further, the ALJ found that there was "a great deal of latitude in determining what items should be disposed of and how." ALJ McGee, however, did find that Able engaged in conduct unbecoming a public employee by "allowing his children to enter the school building to assist in the removal of the lockers."

In support of his decision, the ALJ found that there was "no evidence that [Able] profited from the removal of the property" and "although a criminal complaint was filed, no charges were brought against [Able] for removing the

lockers." ALJ McGee also found the testimony of Able, Williams, and Zielinski to be credible as to "whether or not there was a clear policy for disposal of school property and whether or not that policy was clearly articulated to [Able] or any other custodian within the . . . school district."

The ALJ also determined that Able misused public property when "he allowed the lockers to be removed from the premises as opposed to being disposed of in the dumpster." Specifically, ALJ McGee found that:

> [W]hile [Able] reasonably believed that he had the authority to discard school property that was in disrepair, I conclude that it was not proper for him to allow anyone to remove the lockers from school grounds.

Finally, the ALJ determined that the Board did not provide a "factual basis for 'other sufficient cause,'" and that the "FNDA [did] not specify what conduct should be considered 'other sufficient cause.'"

ALJ McGee accordingly modified the Board's decision to terminate Able and instead imposed a six-month suspension. The ALJ also ordered that Able be awarded "back pay and benefits from six months following the date of termination." Further, in accordance with N.J.A.C. 4A:2-2.10, ALJ McGee directed Able to submit to the Board a "certified statement detailing any

9

employment and income for the period following his termination, with copies of relevant tax and other records and names of addresses of employers."

On April 6, 2018, the CSC conducted an independent evaluation of the record and adopted ALJ McGee's findings of fact and legal conclusions. The CSC accepted the ALJ's recommendation to modify Able's termination to a six-month suspension and stated, "the action of the [Board] in removing [Able] was not justified."

The CSC concluded that because Able was improperly terminated, he was "entitled to back pay, benefits and seniority from the conclusion of the suspension until the date of his reinstatement." The CSC determined that the amount of back pay would be "reduced and mitigated as provided for in N.J.A.C. 4A:2-2.10."

The CSC ordered Able to submit an affidavit of mitigation to the Board "within [thirty] days of [the] decision." In addition, the CSC stated that its decision would "not become final until any outstanding issues concerning back pay [were] finally resolved" and "under no circumstances should [Able's] reinstatement be delayed based on any dispute regarding back pay."

On May 7, 2018, Able's counsel contacted the Board's attorney to discuss his back pay award and requested necessary information to calculate it.

A-5106-18

Specifically, Able's counsel sought his pay rate, including the applicable rate had he not been terminated, and "all hours worked, including overtime of his replacement from [the] date of termination to [the] date of reinstatement, which should be approximately [two-and-a-half] years."

On May 9, 2018, the Board's counsel responded and expressed its intent to appeal the CSC's April 6, 2018 decision and requested a stay of any award pending appeal. The Board's attorney also stated that he would send an affidavit of mitigation for Able to complete.

On May 14, 2018, the Board filed a notice of appeal of the CSC's April 6, 2018 decision. On May 25, 2018, Able notified the assigned Appellate Division case manager that the Board's notice of appeal was improper, as the April 6, 2018 decision was not a final order appealable as of right. On June 5, 2018, Able requested that the CSC review the outstanding back pay issue.

On August 3, 2018, Able completed a mitigation affidavit in support of his back pay claim. Able noted in his affidavit that he "did not receive [u]nemployment [b]enefits or any other compensation during the period [he] was separated from employment." Able further attested that he applied to six different head custodian positions and Home Depot. He also stated that although

11

he received an interview for a position as the head night custodian at Millburn High School, he was denied the position on January 9, 2017.

The affidavit also included Able's 2015 and 2016 tax returns. In contrast to the statement in his affidavit, Able's 2015 tax return reported that he received $4,522 in unemployment compensation benefits. Moreover, his 2016 tax return indicated that he received $12,274 in unemployment compensation. Able did not file a tax return for the 2017 calendar year.

On August 15, 2018, the Board requested that the CSC stay "the back pay matter . . . pending review of the underlying decision to reduce [Able's] termination to only a six[-]month suspension." As to Able's mitigation affidavit, the Board argued that the "financial records . . . [Able] produced [were] incomplete" as he had failed to provide "complete or sufficient tax records, unemployment salary . . . and/or reveal how much income he earned during the 2017 tax year." The Board also maintained that Able's affidavit was "rife with contradictory assertions." In this regard, the Board noted that although Able stated he did not receive unemployment compensation, his tax returns indicated otherwise. Finally, the Board calculated Able's unmitigated back pay as $159,044.84.

On August 21, 2018, the Board withdrew its appeal of the April 6, 2018 CSC decision "until such time as the [CSC] issues a decision in this matter which is considered 'final.'" The Board also stated that the April 6, 2018 decision was not considered final "due to . . . Able's late notification that a dispute still exist[ed] regarding his back pay."

On January 15, 2019, Able completed a second mitigation affidavit in a form provided by the Board. In this affidavit, Able acknowledged that he had received unemployment benefits during his separation period. Able also attested that despite his efforts to find work, he was unable to obtain employment.

On April 16, 2019, the Board informed the CSC that Able failed to provide the requisite documentation to establish that the tax records he provided were the same tax records he submitted to the Internal Revenue Service. Accordingly, the Board claimed in "the absence of necessary documentation" an "accurate calculation" could not be performed, and it would be inappropriate to award back pay until further documentation was provided.

On June 12, 2019, the CSC issued a final agency decision denying Able's request for back pay. In support of its decision, the CSC found that Able "failed to make reasonable efforts to find suitable employment." The CSC noted that except for his denial from the position at Millburn High School, Able did "not

provide any further details about any of the other positions he applied for, such as the dates he submitted his applications or, except for Home Depot, the names of the employers he submitted applications to." In addition, the CSC noted that Able had "an obligation to seek substitute employment in good faith," and concluded that applying for seven different positions "in nearly three years" did not "constitute a reasonable effort to secure employment."

The CSC also acknowledged the discrepancy in Able's affidavit regarding his receipt of unemployment compensation. The CSC noted that "[a]lthough there is a presumption that the receipt of unemployment insurance benefits evidences that an employee sufficiently mitigated during the period of separation . . . this presumption may be rebutted where the appellant did not make a diligent effort to seek employment." The court found that even if Able had received the unemployment benefits, he had not "submitted sufficient evidence to demonstrate a reasonable effort to mitigate his damages." This appeal followed.

II.

Our review of an administrative agency's final determination is limited. In re Herrmann, 192 N.J. 19, 27 (2007). "[A] 'strong presumption of reasonableness attaches'" to the agency's decision. In re Carroll, 339 N.J. Super.

14

429, 437 (App. Div. 2001) (quoting In re Vey, 272 N.J. Super. 199, 205 (App. Div. 1993)). Additionally, we give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility." In re Taylor, 158 N.J. 644, 656 (1999) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)).

The burden is upon the appellant to demonstrate grounds for reversal. McGowan v. N.J. State Parole Bd., 347 N.J. Super. 544, 563 (App. Div. 2002); see also Bowden v. Bayside State Prison, 268 N.J. Super. 301, 304 (App. Div. 1993) (holding that "[t]he burden of showing the agency's action was arbitrary, unreasonable[,] or capricious rests upon the appellant"). To that end, this court will "not disturb an administrative agency's determinations or findings unless there is a clear showing that (1) the agency did not follow the law; (2) the decision was arbitrary, capricious, or unreasonable; or (3) the decision was not supported by substantial evidence." In re Virtua-West Jersey Hosp., 194 N.J. 413, 422 (2008).

When an agency decision satisfies these criteria, we accord substantial deference to the agency's fact-finding and legal conclusions, acknowledging "the agency's 'expertise and superior knowledge of a particular field.'" Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)).

This court will not substitute its judgment for the agency's even though it might have reached a different conclusion. In re Stallworth, 208 N.J. 182, 194 (2011); see also In re Taylor, 158 N.J. at 656-57 (discussing the narrow appellate standard of review for administrative matters).

On questions of law, however, our review is de novo. In re N.J. Dept. of Env't Prot. Conditional Highlands Applicability Determination, 433 N.J. Super. 223, 235 (App. Div. 2013) (citing Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). We are "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93 (1973).

A.    Appeal No. A-5108.

As noted, in this appeal, the Board challenges the CSC's decision upholding the modification of Able's termination to a six-month suspension. The Board asserts that the CSC's decision was arbitrary, capricious, and unreasonable because it erroneously:  1) determined that Able "had engaged in unbecoming conduct in permitting his relatives to remove the lockers but had not engaged in unbecoming conduct in removing the lockers himself"; 2) accepted Able's defense that there was no formal policy related to the disposal of fixed assets, including the need to obtain formal authorization; 3) agreed with

16

Able's contention that he believed the lockers constituted unsalvageable property and his claim that "his conduct should be condoned because the property had already been destroyed"; and 4) failed to apply principles of progressive discipline.

As to its first point, the Board asserts that ALJ McGee's conclusion that Able engaged in conduct unbecoming a public employee by permitting his relatives to remove the lockers but did not engage in unbecoming conduct in removing the lockers himself was "illogical and nonsensical." It further claims that the ALJ's determination "was irrational, as it placed too fine a distinction between actively removing the property and allowing relatives to do so." We disagree.

Contrary to being "illogical and nonsensical," the CSC's decision was based on the ALJ's explicit credibility findings. ALJ McGee specifically found that Able's conduct was not "clandestine" but "consistent with what he believed to be the proper process." In making these credibility findings, the ALJ accepted Able's version of events and rejected that advanced by the Board's witnesses. We are satisfied that the ALJ and CSC's decisions are fully supported by the record and are not unreasonable.

A-5106-18

For similar reasons, we reject the Board's argument that the CSC erred by accepting Able's defense that he was not aware of a "Board policy prohibiting removal of the lockers without authorization and further claiming he believed the lockers were refuse that he was allowed to take at will." Again, the ALJ's findings, which the CSC considered and accepted, are fully supported by the record.

Specifically, the ALJ found that the testimony of Able and Williams was "credible and consistent with respect to whether or not there was a clear policy for disposal of school property and whether or not that policy was clearly articulated to [Able] or any other custodian" within the school district. Able specifically testified that he was not aware of any policy that "prohibits employees from taking stuff that's going to be discarded" and that it was his understanding that he only needed approval to dispose of items with barcodes on them. This understanding was corroborated by Williams' testimony that custodians were essentially permitted to use their discretion in the disposal of items unless they had a barcode.

In sum, we conclude ALJ McGee's determination that Able was not aware of any policy prohibiting him from disposing of the lockers was supported by sufficient credible evidence in the record. Further, because the CSC accepted

ALJ McGee's fully supported findings that Able was not aware that he needed authorization to remove the lockers, the Board's argument that Able did not receive the necessary authorization from his superiors lacks merit.

We reject the Board's reliance on In re Fedo, No. 14-021, 2016 WL 5372982 (Sep. 19, 2016), and In re Layton, No. 2014-2108, 2015 WL 8296205 (July 14, 2015), as those cases are factually distinguishable. In In re Fedo, the appellant was removed by the Parsippany-Troy Hills Department of Public Works (DPW) after he was found to have stolen four sanitation truck tires from the DPW. 2016 WL 5372982, at *1, 8. In In re Layton, appellant removed property from the Ancora Psychiatric Hospital "that did not belong to him and sold it to America Scrap Metal." 2015 WL 8296205, at *7.

Unlike in In re Fedo, Able did not steal the lockers and they were not salvageable as were the tires in that case. 2016 WL 5372982, at *5-6. Further, in In re Layton, the appellant sold the stolen property for profit. 2015 WL 8296205, at *7. Here, the record establishes that Able acted in a manner that was consistent with past practices of custodians at Barringer High School and there was no competent evidence submitted by the Board that Able profited from the removal of the lockers.

We also reject the Board's assertion that Able's removal of damaged property should be considered theft mandating termination. In support, the Board relies on In re Small, No. 2011-4206, 2012 WL 255769 (Jan. 13, 2012) and Dixon v. Newark Housing Authority, No. 10725-91, 1993 WL 548882 (Oct. 13, 1993). Again, these decisions like, In re Fedo and In re Layton, are factually distinguishable and unpersuasive.

In In re Small, the ALJ expressly rejected the appellant's testimony that he had "found [a computer] at the top of a pile of garbage in the dumpster." 2012 WL 255769, at *6. Similarly, in Dixon, the ALJ rejected the appellant's account that metal piping he had taken was simply lying on the ground. Dixon, 1993 WL 548882, at *2-3. Unlike ALJ McGee here, both ALJs in those cases rejected the appellants' claims that they believed the property was discarded and found that they had stolen valuable public property.

Further, ALJ McGee concluded that Able did not attempt to hide or conceal his removal of the lockers and did so because he legitimately believed he was acting in accordance with the proper process. This determination was based on substantial credible evidence in the record and warrants our deference. Indeed, Able testified that he did not believe what he had done was considered

20

stealing and that he was not aware of any policy that barred his relatives from removing unsalvageable lockers.

Nor does Carter v. Cumberland County Welfare, No. 01908-91, 1992 WL 240286 (Jan. 6, 1992), which the Board relies on for the proposition that the "unauthorized taking of even a de minimis item of little to no value constitutes theft of public property" require a different result. In that case, the appellant was terminated from her position at the Cumberland County welfare department after she stole two dollars. Carter, 1992 WL 240286, at * 1-2. Here, the ALJ concluded based on the record evidence that Able's conduct did not qualify as a theft, he was unaware of any policy which required authorization for him to dispose of the lockers under the circumstances, and that he acted in manner that "was consistent with what he believed to be the proper process."

The Board also argues that the imposition of a six-month suspension deviated from principles of progressive discipline "as well as the heightened standard of conduct required of supervisors." Specifically, the Board maintains that because Able had a disciplinary history and was the senior custodian of Barringer, he should have been terminated for the September 7, 2015 incident. Again, we disagree.

21

"To assure proper 'progressive discipline,' and a resulting penalty based on the totality of the work history, an employee's past record with emphasis on the 'reasonably recent past' should be considered." In re Stallworth, 208 N.J. at 199 (quoting West New York v. Bock, 38 N.J. 500, 524 (1962)). "This includes consideration of the totality of the employee's work performance, including all prior infractions." Ibid. Moreover,

> progressive discipline is a flexible concept, and its application depends on the totality and remoteness of the individual instances of misconduct that comprise the disciplinary record. The number and remoteness or timing of the offenses and their comparative seriousness, together with an analysis of the present conduct, must inform the evaluation of the appropriate penalty.
>
> [Ibid.]

Excluding the present matter, Able was charged with five prior disciplinary infractions from 2001 to 2008. From 2001 to 2005, he was substantiated on charges including "chronic or excessive absenteeism or lateness," insubordination, and neglect of duty. In 2008, Able was substantiated for sexual harassment and suspended for fifteen days. For the following seven years, Able was not charged with any disciplinary infractions, and the six-month penalty imposed against Able was the most severe punishment he received throughout his career. Therefore, although Able had a disciplinary history

22

which we do not minimize, his last penalty was imposed well before the September 7, 2015 incident, and his prior conduct was unrelated to the present charges. Under these circumstances, we are satisfied that the CSC's decision to impose a significant six-month suspension was not contrary to principles of progressive discipline.

B. Appeal No. 5106.

Able argues that the CSC's decision to deny him back pay because he did not make reasonable efforts to mitigate his damages was arbitrary and unreasonable. Specifically, Able contends that the CSC: 1) improperly shifted the burden of proof to him to demonstrate that he made a reasonable effort to mitigate his damages; 2) disregarded the holding in Department of Labor and Industry v. Smalls, 153 N.J. Super. 411 (App. Div. 1977), N.J.S.A. 43:21-5(b), and its own regulations by failing to enforce the Board's obligation to reimburse the New Jersey Unemployment Compensation Fund; and 3) erred in denying Able back pay for the ten-week period between its reinstatement decision and Able's actual reinstatement. We reject Able's first two points but find that the CSC abused its discretion when it effectively denied Able back pay for the relevant ten-week period.

The purpose of back pay awards is to make the employee whole and to compensate the employee for his rightful wages.  <u>Decker v. Bd. of Educ. of Elizabeth</u>, 153 N.J. Super. 470, 475 (App. Div. 1977).  As the Supreme Court noted in <u>Mastrobattista v. Essex County Park Commission</u>, 46 N.J. 138, 143 (1965),

> [c]urrent concepts of fair play in employment relationships suggest that persons in the public service who have been suspended or removed on charges later determined to be unfounded should be made whole insofar as possible; they should be entitled not only to restoration of duties but should also suffer no loss in their earnings.

However, back pay awards are subject to common law rules of mitigation.  <u>See Mason v. Civil Serv. Comm.</u>, 51 N.J. 115, 130 (1968) (noting that back pay awards should not permit an employee to be "unjustly enriched" or "unjustly deprived").

Pursuant to N.J.S.A. 11A:2-22, the CSC is given broad authority to award back pay and benefits to reinstated employees.  In this regard, the CSC has adopted regulations implementing this authority, specifically to award back pay to those employees who have had a disciplinary-based termination reversed by the agency or courts.  N.J.A.C. 4A:2-2.10.  In particular, N.J.A.C. 4A:2-2.10 states in relevant part:

(a) Where a disciplinary penalty has been reversed, the Commission shall award back pay, benefits, seniority or restitution of a fine. Such items may be awarded when a disciplinary penalty is modified.

. . . .

(e) Unless otherwise ordered, an award of back pay, benefits and seniority shall be calculated from the effective date of the appointing authority's improper action to the date of the employee's actual reinstatement to the payroll.

The applicable regulations provide that any back pay grant awarded under N.J.A.C. 4A:2-2.10(a) must be reduced by any monies actually earned. N.J.A.C. 4A:2-2.10(d)(3). Additionally, obligations are imposed on employees seeking back pay to affirmatively act:

Where a removal or a suspension for more than [thirty] working days has been reversed or modified or an indefinite suspension pending the disposition of criminal charges has been reversed, and the employee has been unemployed or underemployed for all or a part of the period of separation, and the employee has failed to make reasonable efforts to find suitable employment during the period of separation, the employee shall not be eligible for back pay for any period during which the employee failed to make such reasonable efforts.

[N.J.A.C. 4A:2-2.10(d)(4).]

"Reasonable efforts," defined by N.J.A.C. 4A:2-2.10(d)(4)(ii) include:

[R]eviewing classified advertisements in newspapers or trade publications; reviewing Internet or on-line job

A-5106-18

listings or services; applying for suitable positions; attending job fairs; visiting employment agencies; networking with other people; and distributing resumes.

Further, "the burden of proof shall be on the employer to establish that the employee has not made reasonable efforts to find suitable employment." N.J.A.C. 4A:2-2.10(d)(4)(v).

In O'Lone v. Department of Human Services, 357 N.J. Super. 170, 174 (App. Div. 2003), we held that the CSC[2] may not deny back pay for the period between removal and reinstatement solely on the ground that the employee failed to seek substitute employment. Instead, the CSC must determine whether suitable substitute employment existed, which the employee could have obtained, if he had made a diligent search. Ibid. In doing so, the employer has the initial burden to demonstrate that the employee failed to seek substitute employment or that there were jobs in the local economy that a person with the qualifications and experience of the disciplined employee could obtain, if they made a diligent effort to obtain substitute employment. Id. at 181. If the employer satisfies this evidentiary burden, the burden of proof shifts to the

---

[2] Although O'Lone references the Merit System Board (MSB), on June 30, 2008, the Civil Service Commission was reconstituted and assumed the duties of the Department of Personnel and the MSB. N.J.S.A. 11A:11-2(b).

disciplined employee to establish that suitable substitute employment was unavailable or that the employee could not obtain such employment despite diligent efforts to do so. Ibid.

In Able's first point, he contends that the CSC improperly "held that Able . . . failed to prove he exercised reasonable mitigation efforts, thus reversing the burden of proof specified" in O'Lone and N.J.A.C. 4A:2-2.10(d)(4)(v). Able also argues that the CSC failed to consider as relevant circumstances under N.J.A.C. 4A:2-2(d)(4)(iv) his request for reinstatement and the eight-month delay caused by the Board's "appeal" of the CSC's April 6, 2018 decision. Finally, Able asserts that the CSC erred in finding the Board rebutted the presumption that he "had exercised reasonable efforts to find other employment" because he had received unemployment benefits.[3]

First, we disagree with Able and conclude the CSC did not engage in improper burden shifting when it determined that Able had failed to make reasonable efforts to mitigate his damages. Here, the Board asserted Able's "claim that he applied to only [seven] jobs in the nearly three years he was

---

[3] This presumption arises from the language in N.J.S.A. 43:21-4(c)(1), which provides as a condition to receiving unemployment benefits, an individual must show that they are "able to work . . . [are] available to work, and . . . [have] demonstrated to be actively seeking work."

separated [was] insufficient to meet the standard, especially considering [Able] [did] not provide any evidence other than his attempt at employment with Millburn Public Schools to demonstrate his effort to obtain employment." Further, prior to rendering its decision, the CSC explicitly observed that "[t]he burden of proof shall be on the employer to establish that the employee has not made reasonable efforts to find suitable employment."

Although the Board did not submit its own documentation regarding Able's job search, it properly relied on evidence detailed in Able's mitigation affidavits to establish that he "did not make a reasonable effort to mitigate his losses." Therefore, we agree with the CSC finding that the Board satisfied its burden in establishing that Able failed to seek suitable employment in accordance with O'Lone and N.J.A.C. 4A:2-2.10(d)(4)(v) by relying upon the deficiencies in Able's mitigation affidavits.

We also conclude the CSC's determination that Able failed to mitigate his damages from the period after the completion of his suspension through the April 6, 2018 reinstatement decision was not arbitrary or capricious and based on credible evidence contained in the administrative record. The CSC noted that besides the Millburn position, Able did "not provide any further details about any of the other positions he applied for, such as the dates he submitted his

applications, or, except for Home Depot, the names of the employers he submitted applications to."

Further, the CSC determined that applying for seven jobs over a three-year period did "not constitute a reasonable effort to secure employment." Additionally, we find it significant, as did the CSC, that besides the Millburn position, Able failed to provide any corroborating evidence of his purported applications to five other janitorial positions. For the same reasons, we also conclude that the Board overcame the presumption that Able "had exercised reasonable efforts to find other employment" due to his receipt of unemployment compensation in 2015 and 2016.

We also reject Able's contention that the CSC erred in failing to consider his request for provisional reinstatement, and the eight-month delay caused by the Board's "appeal" of the CSC's April 6, 2018 decision, as "relevant circumstances." N.J.A.C. 4A:2-2.10(d)(4)(iv) provides:

> The determination as to whether the employee has made reasonable efforts to find suitable employment shall be based upon the totality of the circumstances, including, but not limited to, the nature of the disciplinary action taken against the employee; the nature of the employee's public employment; the employee's skills, education, and experience; the job market; the existence of advertised, suitable employment opportunities; the manner in which the type of employment involved is commonly sought; and any

other circumstances deemed relevant based upon the particular facts of the matter.

First, we note that it is unclear from the record whether Able raised either of the issues with the CSC. In any event, we find that Able's arguments do not warrant a reversal of the CSC's June 12, 2019 decision.

With respect to the eight-month delay, purportedly caused by the Board's improper appeal, we note that on June 4, 2018, after the notice of appeal was filed, Able requested that the CSC "review the outstanding" back pay issue. Notably, it does not appear Able informed the Board about this communication with the CSC until June 21, 2018. In addition, Able was officially reinstated on June 18, 2018, ten weeks after the April 6, 2018 decision, and he was under no obligation to mitigate his damages during that period. N.J.A.C. 4A:2-2.10(d)(5).

Similarly, we find no error in any failure by the CSC to consider Able's request for provisional reinstatement. Although we acknowledge that Able's reinstatement would have obviously mitigated his damages, at the time Able made the request, the Board was actively contesting his reinstatement and the ALJ had not yet rendered his decision. Under these circumstances, we conclude the CSC did not abuse its discretion even if it failed to consider Able's request for reinstatement as a reasonable mitigation effort during a contested proceeding.

A-5106-18

In light of our decision that the CSC appropriately denied Able's request for back pay, we conclude that it did not erroneously fail to enforce the Board's obligation to reimburse the unemployment compensation fund. N.J.S.A. 43:21-5(b) provides that "an individual who is restored to employment with back pay shall return any benefits received under this chapter for any week of unemployment for which the individual is subsequently compensated by the employer."

In Smalls, we determined that the Department of Labor

> should be able to recoup benefits paid when it is subsequently discovered that the discharge, necessitating application for the benefits, was in error and the employee is subsequently compensated for that error. That the employer deducts the amount of those benefits from a back pay award should not deprive the Department of its right, given by statute, to recover the money merely because it is in the possession of the employer.
>
> [153 N.J. Super. at 416-17.]

Here, Able fails to acknowledge that this reimbursement requirement is predicated on an award of back pay. Ibid. Specifically, it applies when an employee's award of back pay was mitigated by unemployment compensation benefits. Ibid. Accordingly, the Board was not required to reimburse the unemployment compensation fund because Able did not receive a back pay award

31

for the period prior to his reinstatement, a decision which we affirm for the reasons stated.

We agree, however, with Able's third point that he was entitled to back pay for the period from the April 6, 2018 CSC decision to his date of actual reinstatement on June 18, 2018. N.J.A.C. 4A:2-2.10(d)(5) provides that:

> An employee shall not be required to mitigate back pay for any period between the issue date of a [CSC] decision reversing or modifying a removal or reversing an indefinite suspension and the date of actual reinstatement. The award of back pay for this time period shall be reduced only by the amount of money that was actually earned during that period, including any unemployment insurance benefits received.

Here, under the plain language of N.J.A.C. 4A:2-2.10(d)(5), Able was not required to mitigate back pay for the period between the modification of his removal on April 6, 2018 and his actual reinstatement on June 18, 2018. Moreover, N.J.A.C. 4A:2-2.10(d)(5) requires that the award of back pay be "reduced only by the amount of money that was actually earned during that period, including any unemployment insurance benefits received." The CSC, however, did not inquire into whether Able earned any income during that ten-week period, nor does the record indicate he received any income. Indeed, Able certified in his January 15, 2019 affidavit that he was not "gainfully employed"

during his period of separation, and the record does not include any tax return information identifying Able's income for 2017 or 2018.

Therefore, we reverse that portion of the CSC's June 12, 2019 final agency decision to the extent it denied Able's claim for back pay from April 6, 2018 to June 18, 2018. On remand, Able shall file a certification with the CSC stating whether he received any unemployment benefits for this period and, if so, the amount of such benefits. See N.J.A.C. 4A:2-2.10(d)(5). In the event that Able did receive such compensation, the CSC should determine whether reimbursement to the unemployment compensation fund is necessary under N.J.S.A. 43:21-5(b) or Smalls.

To the extent we have not addressed any of the parties' remaining arguments, it is because we have concluded they are of insufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5106-18