**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2070-20

IN THE MATTER OF MICHAEL
ISNER, CAMDEN COUNTY
CORRECTIONAL FACILITY.

_____

Submitted September 12, 2022 – Decided September 26, 2022

Before Judges Mayer and Bishop-Thompson.

On appeal from the New Jersey Civil Service Commission, Docket No. 2017-3863.

Dvorak & Associates, LLC, attorneys for appellant Michael Isner (Lori A. Dvorak, of counsel and on the briefs; Christine Klimczuk and Grace E. Lempka, on the briefs).

Emeshe Arzón, Camden County Counsel, attorney for respondent Camden County Correctional Facility (Howard L. Goldberg, First Assistant County Counsel, on the brief).

Matthew J. Platkin, Acting Attorney General, attorney for respondent New Jersey Civil Service Commission (Pamela N. Ullman, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Michael Isner appeals from a final agency decision by the Civil Service Commission (Commission) finding support for each of the disciplinary charges filed against him by respondent Camden County Correctional Facility (CCCF), resulting in his termination as a corrections officer. We affirm.

We recite the facts based on the testimony presented to an Administrative Law Judge (ALJ) over the course of four non-consecutive days as summarized in the judge's December 17, 2020 fifty-page, comprehensive, and detailed written decision. The ALJ thoroughly reviewed the testimony proffered by the CCCF's witnesses, Lieutenant John Jones and Captain Rebecca Franceschini, and expert testimony in the field of law enforcement provided by Gary Merline. In her decision, the ALJ also considered testimony offered by Isner and his law enforcement expert witness, Edmond Ciccho.

Isner started working at the CCCF in 2005. On October 9, 2016, while performing his duties related to the admission of inmates, Isner punched an inmate in the head. The inmate filed an excessive force complaint against Isner. Several months later, Isner received a Preliminary Notice of Disciplinary Action suspending him without pay based on the incident with the inmate, advising he faced potential termination. On April 26, 2017, Isner received a departmental hearing on the charges.

On June 7, 2017, CCCF issued a Final Notice of Disciplinary Action terminating Isner, effective January 27, 2017, based on the following grounds:

> incompetency, inefficiency, and failure to perform duties in violation of N.J.A.C. 4A:2-2.3(a)(1); conduct unbecoming a public employee in violation of N.J.A.C. 4A:2-2.3(a)(6); neglect of duty in violation of N.J.A.C. 4A:2-2.3(a)(7), and other sufficient cause in violation of N.J.A.C. 4A:2-2.3(a)(12), specifically violations of [CCCF] Rules of Conduct, 1.1 violations in general; 1.2 conduct unbecoming; 1.3 neglect of duty; 3.6 departmental reports; 3.8 use of force; General Order #13; General Order #73; and General Order #74.

Isner filed an appeal with the Office of Administrative Law. The ALJ held hearings on October 18, 2018, November 14, 2018, December 4, 2018, and December 18, 2018. In addition to the witness testimony, the judge reviewed security footage of the incident between the inmate and Isner.

Isner's testimony

Isner explained he was working in prison admissions on October 9, 2016, and Sergeant Daniel Armstrong served as his supervisor that day. Isner and Armstrong were not carrying handcuffs on that date. Neither officer was told the door to cell 38 was malfunctioning.

According to Isner, ten or eleven inmates were in cell 37 for processing. Isner entered cell 37 to retrieve a specific inmate for processing. When Isner entered cell 37, he claimed the inmate "start[ed] cursing and asking [Isner] . . .

3

when he's goin' upstairs." According to Isner, the inmate made the following threat: "you guys are tough when, you know, when I get outta here come see me."

Isner testified the inmate became "a little more verbally abusive." Isner explained he was moving the inmate to another cell because the inmate was disruptive and "could be a danger to himself." Isner described the inmate as responding negatively, "jump[ing] up abruptly," and "get[ting] in [Isner's] face."

Isner removed the inmate to cell 38 and attempted to close the cell door but "[i]t didn't shut." Believing the inmate used his foot to interfere with the closure of the cell door, Isner told the inmate to "back away from the door." Isner testified the inmate continued cursing and "gesturing with his hands." Isner claimed he and Armstrong commanded the inmate sit on the bench inside cell 38. Because the inmate "refus[ed] to sit on the bench," Isner entered the cell.

In narrating the security footage during his testimony, Isner described the events immediately following his order directing the inmate to sit on the bench:

> I'm gently . . . guiding him towards the bench and right now he's taking the . . . rigid stance. He's stopping right now. He's in the center of the cell and he's becomin' very rigid right here. He comes forward once. He's pushing forward to me and I'm still – I have my hands probably midarm of his and then he pushes again and

4

he's still pushing and I strike him. . . . He goes down. I'm standing. I go down on top of him.

Isner testified he hit the inmate once. However, the ALJ found the surveillance video showed "two movements" after Isner got on top of the inmate, indicating additional blows. Regarding these movements, Isner explained he was "lookin' for [his] cuffs" and experiencing pain in his punching hand. Armstrong and other officers entered cell 38 and restrained the inmate. After the officers secured the inmate, Isner went to the CCCF's medical unit for treatment to his right hand.

After being treated, Isner returned to duty and wrote a report regarding the incident. According to Isner's written report:

> I ordered [the inmate] to step into cell 38. [The inmate] stepped into cell 38 and stopped at the threshold. [The inmate] turned around as I was trying to secure cell 38['s] door. My attempt to secure the door was unsuccessful. I again tried to secure the cell door and was unsuccessful due to [the inmate] blocking the door with his foot. I entered cell 38 and ordered [the inmate] to sit on the bench. At this time [the inmate] stated ["]fuck you[."] I again ordered the to sit on the bench. [The inmate] did not comply. At this time I attempted to move [the inmate] towards the bench. [The inmate] became rigid in stance and resisted my attempts to move him towards the bench. After several attempts to get [the inmate] to comply, I struck [the inmate] with a closed fist to the head to gain control.

Armstrong also filed a written report regarding the incident. In relevant part, Armstrong's report stated:

> Later I was informed by [Isner] the reason the door was not closing was that [the inmate] was using his foot preventing him from securing the door. . . . [Isner] entered the cell and attempted to escort the inmate to the bench. The inmate resisted by tensing his body and refusing to assume a seated position on the bench. Due to the close proximity between [Isner] and [the inmate], [Isner] used physical force specifically by striking [the inmate] with a closed fist to gain compliance.

Lieutenant Jones's Testimony

Lieutenant Jones, who worked for CCCF's Internal Affairs Department for over a decade, testified. Jones investigated the inmate's excessive force complaint against Isner. Based on his review of the surveillance video and interview with the inmate, Jones concluded Isner punched the inmate once in the head while standing, and twice more while on the ground.

Jones recommended Isner be disciplined:

> for striking the inmate in the head three times because the inmate failed to comply with . . . [Isner] wanting him to sit on the bench. . . . [Isner] lied on his general incident report by stating that the inmate was putting his foot in the door. . . . [Isner] also failed to document in his general incident report . . . that he was threatened during the incident. . . . That's one of the important factors of the report. If you are threatened then . . . the report should start off . . . one or two paragraphs should state you were threatened.

6

Captain Franceschini's Testimony

Captain Franceschini sat on the disciplinary review board for Isner's case. Based on her review of the surveillance footage, she initially thought Isner punched the inmate only once. However, she ultimately concluded there were three punches based on the inmate's explanation of the incident.

Merline's Testimony

Gary Merline served as CCCF's expert in the "use of force . . . in the field of law enforcement and corrections." He opined Isner used unjustified force against the inmate. Although Merline agreed an officer need not wait to be assaulted before using force, he testified Isner could have "just walked out" of cell 38, called for help, or taken alternative steps to avoid violence. Additionally, after reviewing the written reports and surveillance video, Merline concluded the inmate never threatened to harm Isner.

Ciccho's Testimony

Ciccho, a retired warden, testified on behalf of Isner as an "expert in the field of corrections and use of force." He explained the admission of inmates is typically the "most volatile" area in a corrections facility. Ciccho testified Isner used an appropriate level of force against the inmate, explaining "you're allowed to use one step [of physical force] above what's being used on you."

7

According to Ciccho, Isner was performing "a legitimate correctional function" in moving the inmate away from the faulty cell door. Ciccho testified that just before Isner struck the inmate, the inmate "resisted sitting" and "tensed up and came . . . in a motion towards" Isner. Based on the inmate's actions, Ciccho concluded Isner had an objectively reasonable belief the inmate was about to assault him.

After hearing the witnesses' testimony and reviewing the documentary evidence, including the surveillance video, the ALJ affirmed Isner's termination, finding CCCF "sustained its burden of proof." In assessing the credibility of the witnesses, the judge concluded the testimony provided by Jones and Franceschini was "consistent with the documentary and video evidence." The judge reasoned their testimony "made sense and hung together" in explaining what occurred on October 9. The judge rejected Isner's credibility challenges regarding the testimony offered by Jones and Franceschini, finding no evidence of animosity, bias, or departmental politics.

Moreover, the ALJ found the expert testimony provided by Merline more credible than the expert testimony offered by Ciccho. She noted Merline's testimony "lacked any material inconsistencies" and his analysis of the surveillance video and documentary evidence "made sense." On the other hand,

the judge found Ciccho's testimony sought to "scapegoat[]" Armstrong, and "appeared to be a contrived attempt to bridge and explain the inconsistencies in [Isner]'s reports and . . . interview . . . and justify Isner's inappropriate use of force."

The ALJ devoted thirty pages of her written decision to her factual findings. She noted Isner did not check the functionality of the door to cell 38 prior to his shift as required and failed to wear his duty belt, which would have included handcuffs, pepper spray, and a radio.

The judge found the inmate expressed his unhappiness about the delay in processing him and, thereafter, the situation between Isner and the inmate escalated into a mutual exchange of profanities. She explained Isner attempted to move the inmate to cell 38 to "muffle his verbal outbursts" and protect the inmate from the other inmates who were sleeping in cell 37.

Upon entering cell 38, the ALJ noted the inmate turned and faced Isner but did not sit on the bench. The judge observed the inmate was in the cell a sufficient distance such that his feet were not in the path of the cell door and no other body parts appeared to impede closure of the door.

The judge saw Isner attempt to shut the door to cell 38 three times. Each time, the cell door would not shut. Believing the inmate was obstructing the

closure of the door, the judge found Isner became frustrated, upset, or angry. Isner again instructed the inmate to sit on the cell bench and the inmate refused. Isner then grabbed the inmate's arms, which were down by the inmate's sides. the inmate did not flail or raise his arms while continuing to refuse to sit on the bench as instructed.

While Isner held the inmate's arms, the inmate became rigid and leaned slightly into the officer. In what the judge held to be a disproportionate response to the inmate's actions, Isner punched the inmate with a closed fist to the left side of the inmate's head. She noted both men fell to the cell floor and struggled as Isner attempted to control and handcuff the inmate. Because Isner lacked handcuffs, another officer handcuffed the inmate.

Based on her review of the surveillance video and testimony, the ALJ concluded Isner's use of force was not in self-defense or to defend others against a physical assault. Nor were Isner's actions an attempt to prevent serious damage to property, prevent the inmate from escaping, quell a riot or disturbance, or prevent a suicide. According to the judge, the inmate's refusal to comply with Isner's orders did not constitute an immediate threat to the security of the prison.

A-2070-20

The judge noted the inmate made no attempt to escape and/or make any furtive movements while in cell 38. The inmate did not flail his arms. Indeed, the inmate's arms remained at his side during the entire confrontation. Thus, the judge rejected Isner's explanation that he feared an immediate threat to his personal safety and concluded the use of physical force under the circumstances was unwarranted.

In reviewing Isner's written report prepared immediately following the incident, the judge found Isner never indicated any threats made by the inmate. Rather, Isner wrote he punched the inmate in the head because the inmate refused to sit on the bench and became rigid. Isner offered no other reason in his written incident report to explain the immediate need for use of physical force. The judge noted Armstrong's written report mirrored Isner's version of the incident and also made no mention of any threats.[1]

The inmate filed a use of force complaint against Isner and the CCCF investigated. As part of the internal affairs investigation, the inmate stated Isner punched him three times in the head and both men fell to the ground.

---

[1] Following the incident, Isner charged the inmate with several institutional infractions. However, Isner never charged the inmate with making threats against him.

CCCF's Internal Affairs personnel also interviewed Isner. It was during this interview that Isner expanded his version of the events and first stated he punched the inmate because he felt threatened. Based on Isner's expanded explanation of the circumstances leading to the incident, the judge found his original written report inaccurate and untruthful because it omitted material facts and events, constituting a violation of departmental policies and regulations.

The judge further found Isner had multiple options to deescalate the situation. For example, Isner could have requested assistance from Armstrong or another officer in securing the inmate. Also, if Isner had worn his duty belt as required, he could have handcuffed the inmate or deployed pepper spray instead of striking the inmate. Alternatively, the judge commented Isner could have returned the inmate to another cell with a functioning door, such as cell 37. She added Isner could have taken a moment to calm himself, which Isner admitted could have deescalated the situation.

Additionally, the ALJ found Isner was not justified in punching the inmate given the inmate's actions. Isner admitted punching the inmate because the inmate refused to sit on the bench in cell 38. However, the judge noted the prison facility had no policy requiring the inmate to sit on the bench. Under the totality of the circumstances, the judge found Isner's use of physical force

12

impermissible. She also explained Isner belatedly and improperly included additional "facts" to support his use of force not contained in his written report regarding the incident.

Based on the foregoing facts, the ALJ found Isner "failed to perform his duties" by punching the inmate to "make him obey an order to sit on the . . . bench." She concluded Isner omitted material details from his report, chose not to carry the proper equipment, and failed to inspect the cell door at the beginning of his shift. Thus, the judge held "[Isner]'s behavior did rise to a level of incompetency, inefficiency, and failure to perform duties, in violation of N.J.A.C. 4A:2-2.3(a)(1)."

Further, the ALJ found Isner's conduct "adversely affected the morale or efficiency" of the CCCF and tended to "destroy public respect . . . of governmental services." Specifically, the judge found Isner failed to show the inmate posed any threat and failed to deescalate the situation by means other than the use of force. The judge explained the exact number of times Isner punched the inmate was irrelevant because the circumstances did not permit Isner to use any such force. Thus, the judge held Isner's lack of judgment rose "to a level of conduct unbecoming a public employee" contrary to N.J.A.C. 4A:2-2.3(a)(6).

The ALJ also found Isner "neglected his duty when he failed to wear his duty belt, failed to inspect cell 38's door at the start of his shift, failed to accurately report the incidents . . . in his [reports], and used excessive force" in violation of N.J.A.C. 4A:2-2.3(a)(7).

The judge also concluded Isner violated the CCCF's rules of conduct. Specifically, Isner violated CCCF Rule 1.1, which states:

> Any employee who violates any rule, regulation or procedure, order or directive, either by an act of commission or omission, whether stated in this manual or elsewhere, or who violates the standard[] operating procedure as dictated by departmental practice, is subject to disciplinary action . . . based on the nature of the rule, regulation, procedure, order or directive violated, the severity and circumstances of the infraction and the individual's record of conduct.

She also found Isner violated CCCF Rule 1.2, requiring:

> All personnel . . . to conduct themselves, both on and off duty, in such a manner as to reflect favorably on the department. Conduct unbecoming an employee shall include that which brings the department into disrepute, reflects discredit upon the employee as a member of the department, or which impairs the operation or efficiency of the department or employee.

Further, the judge held Isner violated CCCF Rule 1.3, which requires personnel:

> . . . to give suitable attention to the performance of their duties. Any act of omission or commission indicating

14

the failure to perform or the negligent performance or compliance to any rule, regulation, directive, order or standard operating procedure as dictated by department practice or as published, which causes any detriment to the department, its personnel, any inmate, prisoner, or to any member of the public shall be considered neglect of duty.

Additionally, the judge explained Isner violated CCCF Rule 3.6, which requires him to

> submit all necessary reports . . . prior to going off duty after the request by the supervisor of an incident necessitating a report. . . . Reports submitted by personnel shall be truthful and complete. Personnel shall not knowingly enter or cause to be entered any inaccurate, false, or improper information in any departmental report.

The judge also concluded Isner violated CCCF Rule 3.8, which states:

> [p]ersonnel shall not inflict corporal punishment on . . . any inmate . . . nor shall they strike or lay hands on an inmate . . . unless it is in self-defense or unless to prevent escape, serious injury to person or property, to quell a disturbance, or effect an arrest where resistance is offered. In all circumstances, only the amount of force necessary to accomplish the desired result is to be used.

In addition to the foregoing rule violations, the ALJ found Isner violated the following General Orders of the CCCF: General Order #13, identifying the specific circumstances allowing use of force; General Order #73, requiring department employees conduct themselves in a manner that will not bring

15

discredit or criticism to the department; and General Order #74, mandating department personnel conduct themselves in a professional and ethical manner at all times and prohibiting conduct which detracts from a professional and ethical manner which may lead to disciplinary action.

The ALJ also found Isner violated N.J.A.C. 4A:2-2.3(a)(12), other sufficient cause, because he deviated from "the implicit standard of good behavior that devolves upon one who stands in the public eye as an upholder of that which is morally and legally correct."

In deciding the penalty to be imposed for Isner's impermissible use of force and violations of the CCCF's General Orders and Rules, the ALJ acknowledged Isner's "uneventful disciplinary record," that assignment to admissions duty is "the most volatile area of the jail," and statements by other CCCF personnel that Isner was not a "hot head." Notwithstanding these mitigating facts, the ALJ noted Isner's story changed over time regarding threats made by the inmate, his filing of an inaccurate report, and the seriousness of his single instance of excessive force. After considering the evidence, the ALJ found that

> progressive discipline must be bypassed. . . . Regrettably, [Isner]'s conduct, which appears out of the norm for his service and demeanor, was so severe and egregious that the penalty of removal of his

employment effective January 27, 2017 is justified. [Isner]'s frustration or upset and anger got the best of his judgment and reasonableness.

On February 5, 2021, the Commission issued its decision, accepting and adopting the ALJ's initial decision in its entirety. The Commission found "the action of the appointing authority in removing Isner was justified" and "therefore affirm[ed] that action and dismisse[d] the appeal of [Isner]."

On appeal, Isner repeats the arguments presented to the ALJ and the Commission. He argues the CCCF presented insufficient evidence for the ALJ to sustain the charges against him. Specifically, he claims entitlement to the defense of anticipatory use of force in support of his actions. Further, Isner contends progressive discipline rather than termination was warranted. We disagree.

Our review of agency decisions is limited. In re Herrmann, 192 N.J. 19, 27 (2007). An administrative agency's final quasi-judicial decision "will be sustained unless there is a clear showing that it is arbitrary, capricious, unreasonable, or that it lacks fair support in the record." Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd of Trs., Police & Fireman's Ret. Sys., 206 N.J. 14, 27 (2011)). The burden of

proving a decision was arbitrary, capricious, or unreasonable is on the party challenging the agency action. Lavezzi v. State, 219 N.J. 163, 171 (2014).

We must determine whether there is substantial evidence in the record to support the agency's decision and whether, applying the law to the facts, the agency reached a conclusion that "could not reasonably have been made on a showing of the relevant factors." Allstars Auto. Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (quoting In re Stallworth, 208 N.J. 182, 194 (2011)). If the agency's decision comports with these requirements, "a court owes substantial deference to the agency's expertise and superior knowledge of a particular field." Herrmann, 192 N.J. at 28.

Additionally, we give "due regard to the opportunity of the one who heard the witnesses to judge . . . their credibility." In re Taylor, 158 N.J. 644, 656 (1999) (quoting Close v. Kordulak Bros., 44 N.J. 589, 599 (1965)). Regarding the testimony of expert witnesses, we rely upon the trier of fact's "acceptance of the credibility of the expert's testimony and [the judge's] fact-findings based thereon, noting that the [judge] is better positioned to evaluate the witness' credibility, qualifications, and the weight to be accorded [to his or] her testimony." In re Guardianship of D.M.H., 161 N.J. 365, 382 (1999) (citing Bonnco Petrol Inc. v. Epstein, 116 N.J. 599, 607 (1989)).

Our deference to agency decisions "applies to the review of disciplinary sanctions as well." Herrmann, 192 N.J. at 28. "In light of the deference owed to such determinations, when reviewing administrative sanctions, 'the test . . . is "whether such punishment is so disproportionate to the offense, in light of all of the circumstances, as to be shocking to one's sense of fairness."'" Id. at 28-29 (quoting In re Polk, 90 N.J. 550, 557 (1982)).

Applying these principles, we reject Isner's claim that there was insufficient evidence to sustain the ALJ's findings regarding his conduct, rendering the Commission's decision arbitrary, capricious, and unreasonable. We discern no basis for disturbing the Commission's determination that Isner should be removed from his employment as a corrections officer after violating several of the CCCF's policies, embodied in its General Orders and Rules, and his use of excessive and impermissible force against an inmate who was not threatening the safety or security of the officer, the facility, or himself. Here, the ALJ found the testimony and evidence, including the surveillance video of the incident between the inmate and Isner, supported the inmate's version of the events. Additionally, the ALJ found the testimony provided by Isner and his expert was not credible. The ALJ's factual findings, adopted by the Commission, are entitled to our deference.

We also reject Isner's argument that progressive discipline, rather than termination, was warranted. "Progressive discipline [may be] bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property." Stallworth, 208 N.J. at 196-97 (citing Herrmann, 192 N.J. at 33).

After reviewing the record, there is no basis to alter the discipline imposed in this case. Isner was responsible for processing the inmate and had the ability to deescalate the situation with the inmate without resorting to physical violence. While Isner lacked any prior disciplinary record, the ALJ found Isner's story changed over time regarding threats made by the inmate, and he filed an inaccurate report contrary to the CCCF's General Orders and Rules. The judge further explained the severity and egregiousness of Isner's excessive use of force against the inmate, as depicted in the surveillance video and supported by the credible testimony, warranted termination. Under the circumstances, we have no cause to differ with the Commission's adoption of the ALJ's recommendation to terminate Isner.

We affirm the agency's final decision for the reasons expressed by the Commission, incorporating the detailed findings of fact and conclusions of law rendered by the ALJ Judge in her comprehensive written decision.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2070-20