**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0747-23

IN THE MATTER OF
JUDY BELLAMY,
MERCER COUNTY
CORRECTIONS CENTER.

_____

Argued February 5, 2025 – Decided April 9, 2025

Before Judges Currier and Paganelli.

On appeal from the New Jersey Civil Service Commission, Docket No. 2023-1588.

Wayne S. Browne argued the cause for appellant Judy Bellamy (Alterman & Associates, LLC, attorneys; Stuart J. Alterman and John A. Ferner, on the briefs).

Michael Anthony Amantia, Assistant County Counsel, argued the cause for respondent Mercer County Corrections Center (Paul R. Adezio, Mercer County Counsel, attorney; Michael Anthony Amantia, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey Civil Service Commission (Bernadette Dronson, Deputy Attorney General, on the statement in lieu of brief).

PER CURIAM

Appellant Judy Bellamy appeals from the Civil Service Commission's (CSC) final agency decision removing her from her position as a County Correction Police Officer for the Mercer County Corrections Center (MCCC). Because appellant has not demonstrated the decision was arbitrary capricious or unreasonable, we affirm.

Appellant began working for the MCCC in 2001. In September 2022 she was overseeing the medical unit when the events leading to her removal occurred. We derive the facts from the testimony given by appellant and Sergeant Nicholas Mauro, her supervisor, during the hearing before the Administrative Law Judge (ALJ).

According to appellant, she was working in the medical unit when a new inmate fell asleep while waiting for an intake health evaluation. When the inmate woke up and realized he still had not been evaluated, he started asking where the nurse was. Appellant attempted to calm the inmate down but was unsuccessful and the inmate began yelling that he no longer wanted to wait.

Appellant stated she ensured "all [her] civilians were in a safe area" and determined "there was no imminent threat." She said there was "a [mechanical] problem with the [m]edical door . . . [so] it was not secured at that time."

A-0747-23

Appellant testified she was having trouble de-escalating the situation, so she called for Sergeant Mauro over the radio but did not call a code.[1]  When asked for an explanation of her actions, appellant testified:  "[A]t that particular time, I did not need officers.  I just needed an authority figure."

According to appellant, she said over the radio, "I need you in [m]edical, please." When asked if she recalled whether she said "Sergeant Mauro" over the radio or just "Mauro," appellant stated:

> To my recollection, I did say "Sergeant Mauro."  Our radios' transmissions sometimes are cut off when you press the button.  The first word sometimes is not heard.  I try to make it a practice to wait and then respond.  After I press the button, . . . I try not to just go right over the radio.  But in that instant, because . . . I wanted to see if he could come to Medical so we can quell the situation, I pressed the button and just said, "Sergeant Mauro, can you come to [m]edical, please?"

Appellant said that after she called for Sergeant Mauro over the radio, the inmate got up from his chair and began gathering his belongings.  Appellant then radioed to Sergeant Mauro again, this time saying, "[c]an you please come to [m]edical?"  Appellant said she was standing in front of the door, because it was not secured properly.  The inmate began approaching appellant and she put out

---

[1]  MCCC uses certain codes when a situation requires a quick response from officers.

A-0747-23

her hand and said "Come on, have a seat now. You know, we've got to get this done." The inmate then backed away, put his things down, and sat down. Once the inmate calmed down, the nurse completed the evaluation, and then the inmate was taken to the housing unit.

Appellant testified she did not hear Sergeant Mauro's radio transmission telling her to call him at extension 2310. She stated her next action after the events were resolved was to call Master Control with the count of the number of inmates in the medical unit. She was required to provide this count every thirty minutes.

Appellant called extension 2217 to report the count. When Officer Griffith answered the phone in Master Control, appellant asked if he had seen Sergeant Mauro. Griffith responded, "Yes, he's sitting right here in Master Control at the back desk." Appellant replied, "Oh, okay. I was calling for him over the radio, [but] . . . [h]e never responded." Griffith then transferred appellant to Sergeant Mauro at extension 2310.

Appellant recalls the following conversation with Sergeant Mauro:

> Once Sergeant Mauro picked up the phone, he answered the phone, "Sergeant Mauro," I said, "Hey, Sarge, how are you?" . . . I said, "What's going on? I was calling for you over the radio. What happened?" He said, "Oh, well, I responded to you," and I said, "You responded?" He said, "I responded to you twice."

A-0747-23

I said, "Oh, I didn't hear that."  He said, "Well, I told you to call 2310."  I said, "Well, sir, I didn't hear that."  He said, "Well, what's the problem?"  I said, . . . "Well, I needed you."  I said, "But it's okay.  I handled the situation and everything's okay now. . . But Sarge, you said you responded to me twice and I didn't respond back and you also said you told me to call 2310 and I didn't call.["]  I said, "Not for nothing, I'm not trying to be funny, but [don't you] think maybe there was a reason?  Maybe you should come and check and see what was going on in the area?"  Because when [he] told me that, "I told you to call 2310," I said, "Well, I was dealing with the issue with the inmate."  I said, "But if you responded to me twice and . . . I did not respond and you told me to call 2310 and I did not call, you didn't think that was enough for you [to] come and check to see what was going on in the area?  Usually, if I'm calling for a supervisor or for a supervisor to call me, I would respond."  So he said to me at that point in time, "Well, I was busy."  I said, "Okay. . . . No more?" and he said, "No more."  So I held the phone for a few seconds, nobody said anything, and I hung up.

Appellant stated that about fifty minutes after the phone call, Sergeant Mauro came to the medical unit and they had a conversation similar to what she reported was said earlier over the phone.  Sergeant Mauro then asked appellant to write an incident report.  Appellant replied:  "An incident report on?  On what would you like the incident report?  I didn't call a code.  I handled the situation.  Nobody was hurt.  Nobody was injured.  And the inmate was seen and sent to the unit with . . . no further problems."

5

In response, Sergeant Mauro said, "I need you to write me an incident report on what happened between you and the inmate that you felt the need to call me." Appellant said she would write the report. Appellant testified she was "never loud or disrespectful."

Sergeant Mauro remembered the events differently. He testified that during his shift, he received a radio transmission from appellant requesting assistance in the medical unit. Appellant said "Mauro, I need to see you in [m]edical." Sergeant Mauro said he responded to the transmission, requesting appellant call him at the extension for the phone in the Master Control area, which is where he was at the time. Sergeant Mauro stated appellant did not call the extension he provided but rather called a different extension and the call was then transferred to him.

According to Sergeant Mauro, appellant asked him, in a "loud and disrespectful tone," why he did not come to the medical unit as she asked. Sergeant Mauro responded by saying if appellant was having an issue with an inmate and needed a code, she should have called a code. In response, appellant stated, in what Sergeant Mauro again described as a disrespectful tone, "I don't need you anymore, I handled it." Before Sergeant Mauro could respond, appellant hung up.

6

Thereafter, Sergeant Mauro went to the medical unit to address the situation. He told appellant she should not "order" him to come to medical. If there was an actual issue, she should call a code. He also said it was disrespectful for an officer to call their superior by last name only, without using their title. Bellamy responded she thought it was disrespectful Sergeant Mauro did not come to help her when she asked. Sergeant Mauro replied that he does not take orders from her, and reiterated that if she needed assistance, she should have called a code. Bellamy said, "Yeah, okay, we don't need to talk about this anymore. I'll just call a code one for every incident." Sergeant Mauro then advised her not to misuse the code system and tie up resources unnecessarily. Sergeant Mauro testified that appellant was "very loud and disrespectful throughout the entire incident."

However, during cross examination, Sergeant Mauro agreed that, in a non-emergent situation, an officer "could use the radio to request a supervisor to call [them] at their convenience."

Sergeant Mauro prepared a written incident report as he believed appellant acted disrespectfully. Sergeant Mauro stated in the report, "I feel that administrative action is required due to the failed conversation with [appellant] and ongoing issues with disrespecting her superiors."

A-0747-23

Sergeant Mauro also asked appellant to submit a report. However, instead of addressing the conversation with the Sergeant, appellant only discussed the incident that prompted the radio transmission.

A Preliminary Notice of Disciplinary Action was filed in September 2022 and amended in November. The charges brought against appellant were for insubordination, N.J.A.C. 4A:2-2.3(a)(2); conduct unbecoming a public employee, N.J.A.C. 4A:2-2.3(a)(6); other sufficient cause, N.J.A.C. 4A:2-2.3(a)(12); C4- verbal abuse of a patient, client, resident or employee; C9-insubordination—intentional disobedience or refusal to accept a reasonable order, assaulting or resisting authority, disrespect or use of insulting or abusive language to a supervisor; and D6- violation of administrative procedures and/or regulations involving safety and security. The notice informed appellant that MCCC was seeking her removal.

After both appellant and Sergeant Mauro testified, the hearing officer upheld the charges and found removal was warranted considering appellant's "multitude of infractions" and several prior disciplines for insubordination. A Final Notice of Disciplinary Action was issued on January 20, 2023, removing appellant from her position.

A-0747-23

Appellant appealed the decision to the Office of Administrative Law and, after a hearing, the ALJ issued an initial decision in June 2023, finding MCCC met its burden to establish the charges and concluding removal was warranted. The ALJ noted appellant had raised several issues in her written summation that he did not consider.

On appeal, the CSC remanded for the ALJ to elaborate on his credibility determinations. The CSC was "concerned that th[e] matter was solely based on the testimony of the appellant and the . . . Sergeant involved in the incident."

In his opinion following remand, the ALJ stated it found Mauro's version of events more credible and added the following:

> [Appellant]'s testimony was based on actions that possibly may have happened. Not one, but two radio transmissions <u>may</u> have "stepped" on each other, meaning two people could have been talking at the same time. Mauro <u>may</u> have thought [appellant] hung up on him, but she only hung up the phone after several seconds of dead air. [Appellant] <u>may</u> have believed that Mauro wanted a report about the incident that occurred with the inmate in medical. However, while these things "may" have happened, this tribunal is charged with deciding this matter by a preponderance of the evidence standard, and not by a beyond a reasonable doubt standard. Mauro stated that he was not referred to by his inferior officer as "sergeant," that [appellant] hung up the phone on him, and that he was clear to [appellant] about what type of report he wanted from her. . . . Mauro was a credible witness, and from my experience, knowledge, and common observation, I can

accept his testimony as more probable than [appellant]'s under the circumstances.

In addition, Mauro testified that he advised [appellant] that she will not order him to a unit, and if a code is needed, she should call one. [Appellant] then responded, "Yeah ok, we don't need to talk about this anymore. I will just call a Code [one] for every incident." Mauro attempted to continue the conversation with [appellant], but she continued her disrespectful behavior and became belligerent, thus prompting him to write a report. Mauro stated that he interpreted [appellant]'s response about calling a code for every incident as a threat to misuse the code system and obtain immediate response when not warranted. Such an action would put officers at risk and tie up resources. [Appellant] was disrespectful and belligerent, and Mauro was not unreasonable in interpreting [appellant]'s response about calling a code for every incident as a threat to misuse the code system and obtain immediate response when not warranted. Once again, Mauro was a credible witness, and from my experience, knowledge, and common observation, I can accept his testimony as more probable than [appellant]'s under the circumstances.

In its remand order, the CSC also expressed concern that this matter was decided solely based on the testimony of the appellant and Mauro. That is accurate. This tribunal did and continues to decide this matter solely based on the testimony of the appellant and Mauro. This tribunal does not need any additional corroborating witnesses, testimony, videos, or any other type of evidence to make this determination. In addition, there is no additional evidence in the record concerning the incident between Mauro and [appellant]. Credibility does not depend on the number of witnesses presented in a matter. Credibility can be

> determined from the testimony of only one credible witness. The facts of a case can be determined from the testimony of only one credible witness. The facts of this case can be determined from the testimony of one credible witness, Mauro. For these reasons, this tribunal believes it has provided clear and substantial support for the credibility determinations made herein, as required in the remand.

The ALJ again found defendant met its burden of proof and removal was warranted.

On November 1, 2023, the CSC deemed-adopted the ALJ's decision as the final decision.

On appeal, appellant contends the CSC erred by not requiring the ALJ to consider MCCC's compliance with the New Jersey Attorney General Guidelines (Guidelines). This argument was first raised to the ALJ in the written summations. Appellant further asserts that even if she is guilty of all the charges asserted against her, removal was not an appropriate penalty.

Our review of a quasi-judicial agency determination is limited. Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)).

We "review[] agency decisions under an arbitrary and capricious standard." Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n, 237 N.J. 465, 475 (2019). See Melnyk v. Bd. of Educ. of the Delsea Reg'l High Sch. Dist.,

11

241 N.J. 31, 40 (2020). "An agency's determination on the merits 'will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo, 206 N.J. at 27). The party challenging the administrative action bears the burden of making that showing. Lavezzi v. State, 219 N.J. 163, 171 (2014).

Our review of an administrative action is generally limited to three inquiries:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [Allstars, 234 N.J. at 157 (quoting In re Stallworth, 208 N.J. 182, 194 (2011)).]

We are not bound by an agency's interpretation of a statute or its determination of a strictly legal issue outside its charge. Id. at 158.

In her written summation before the ALJ, appellant asserted for the first time that the charges against her should be dismissed because MCCC violated the Guidelines in several respects. In its opinion the ALJ stated:

Appellant also argues in her closing brief, in Points two through six, that all charges should be dismissed because [MCCC] was mandated to follow the . . . Guidelines as to Internal Affairs and failed to do so. In particular, that [MCCC] failed to send a "target letter," failed to properly interview witnesses and record those interviews, failed to provide basic due process, and failed to follow procedures and Internal Affairs guidelines regarding investigations.

Unfortunately, these arguments, having been raised for the first time in . . . appellant's closing brief, are not timely. These arguments should properly have been raised at the hearing. Appellant did not call witnesses to provide testimony concerning these allegations. Appellant may have raised these issues in pre-trial motions for dismissal or summary decision but failed to do so. As such, because these allegations require fact-finding, these allegations cannot be addressed at this time, when all testimony has been completed and the record closed. Therefore, the allegations raised by appellant concerning [MCCC]'s mandate to follow the . . . Guidelines as to Internal Affairs involve factual questions about how the investigation was conducted. As no factual proof about these allegations was provided, they are rejected and dismissed.

We are satisfied the ALJ properly exercised his discretion in declining to consider issues raised for the first time during written summations. The Guidelines were not part of the record,[2] and there was no testimony regarding them or their applicability to these circumstances.

---

[2] The Guidelines were not included in the appellate record.

Notwithstanding, the Guidelines do not apply to MCCC. In pertinent part, they state: "This policy, the procedures set forth in the policy and the legal citations contained in the text are intended for implementation by all State, county and municipal law enforcement agencies." Attorney General Guidelines Internal Affairs Policy & Procedures § 1.0.13 (2019). Updated versions of the Guidelines contain similar language. As MCCC is not a "law enforcement agency," appellant's arguments regarding their applicability to her situation are immaterial.

We turn to the imposed punishment of removal. Appellant contends a suspension between 60 and 120 days would be more suitable.

In assessing the penalty, the ALJ considered but rejected the concept of progressive discipline as not appropriate here. The ALJ noted appellant's extensive disciplinary record including: a five-day suspension for insubordination in 2012; a ten-day suspension in 2015 for neglect of duty and sleeping on the job; a major suspension of eight days for lateness in 2016; a second suspension for insubordination in 2021; and a twenty-five day suspension for insubordination, violation of administrative procedures, and/or regulations involving safety and security and fighting or creating a disturbance

14

for insubordination in 2023. The ALJ further noted there were "many other disciplinary actions for time and attendance matters."

The ALJ described appellant's actions as "egregious." The ALJ stated:

> In this situation, appellant did not exercise tact, restraint and reasonable judgment, and she did not attempt to defuse a situation, which in fact, did escalate. Her conduct was disrespectful, defiant, and in some ways, outright belligerent. And this conduct was not towards an inmate or a co-worker, but towards her supervisor. Such actions from an employee in the position of appellant is unacceptable. In a corrections setting, an officer must control her behavior and her emotions, and she must respect the authority of her supervisors and superior officers. Reasonable orders from supervisors must be complied with. This type of para-military command is in place to ensure the proper workings of a correctional facility. One representing law and order to the citizenry must present an image of personal integrity and dependability. It is not possible to see how the [MCCC] could continue to allow appellant to remain in her position. The removal was necessary to maintain the diligence and integrity of the [MCCC]'s staff.
>
> The removal of appellant is not inappropriate. Serious acts of insubordination and conduct unbecoming can result in termination. In addition, based on the concept of progressive discipline, appellant's prior history also calls for removal. She has been given many prior chances. Despite those chances, her behavior caused her many previous disciplinary infractions. She has been disciplined on three prior occasions for insubordination. [MCCC] need not wait for another instance of insubordination to occur. The

15

action by [MCCC] of removing appellant was acceptable.

As our Supreme Court has found, progressive discipline is encouraged when appropriate. Town of W. N. Y. v. Bock, 38 N.J. 500, 523-24 (1962). However, "progressive discipline has been bypassed when an employee engages in severe misconduct, especially when the employee's position involves public safety and the misconduct causes risk of harm to persons or property." In re Herrmann, 192 N.J. 19, 33-34 (2007).

The CSC adopted the ALJ's determination that removal was the appropriate penalty in light of appellant's lengthy disciplinary record including multiple instances of insubordination. A corrections officer is held to a higher standard of conduct than an ordinary public employee. In re Ambroise, 258 N.J. 180, 202 (2024); see also In re Phillips, 117 N.J. 567, 576-77 (1990).

The CSC's decision was not arbitrary, capricious or unreasonable as it was supported by the credible evidence in the record.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

16